Juan TREVINO, Appellant,

v.

John J. DAHM, Warden, Appellee.

No. 92–1863.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 17, 1993.

Decided Aug. 13, 1993.

Gregory J. Beal, Ogallala, NE, argued, for appellant.

Kimberly A. Klein, Asst. Atty. Gen., Lincoln, NE, argued, for appellee.

Before FAGG, Circuit Judge, HEANEY, Senior Circuit Judge, and BEAM, Circuit Judge.

BEAM, Circuit Judge.

Juan Trevino appeals from the district court's denial of his habeas petition. We affirm.

## I. BACKGROUND

After a jury trial, Trevino was convicted of second-degree murder, attempted murder, first degree assault, and three counts of use of a firearm to commit a felony. He was sentenced to life imprisonment for the second-degree murder conviction; fifteen to thirty years for the attempted murder conviction; three to six years for the first-degree assault conviction; and six years imprisonment for the firearms convictions. With the exception of the sentence for first-degree assault, all of Trevino's sentences are to be served consecutively. On direct appeal, the Nebraska Supreme Court affirmed Trevino's convictions. *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988). Trevino filed a habeas petition in the federal district court for the District of Nebraska pursuant to 28 U.S.C. § 2254. In that petition, he raised five principal claims. He alleged that he was deprived of his right to due process when the district court: (1) permitted the prosecution's forensic expert to testify about an inconclusive test performed on a blood stain found on petitioner's clothing; (2) admitted evidence of several cartridges allegedly found in Trevino's possession; (3) admitted identification testimony which had been tainted by prejudicial pretrial procedures; and (4) refused to permit Trevino's expert witness to testify on the subject of human perception and memory. Trevino's fifth claim alleged that his convictions were based on insufficient evidence. The magistrate judge determined that claims two and four were procedurally barred and that the other three claims were meritless. The district court adopted the magistrate judge's recommendations and denied Trevino's habeas petition. Trevino appeals.

## II. DISCUSSION

On appeal, Trevino first argues that his claims are not procedurally barred. He also reasserts the merits of all five of his habeas claims.

### A. Procedural Bar

The district court determined that Trevino raised for the first time on habeas a due process challenge to the district court's decision excluding his proffered expert testimony on the reliability of witness identifications. After reviewing the record of the state court proceedings, the district court concluded that Trevino had previously contested the exclusion of this evidence solely on state law grounds. The district court further found that Trevino's constitutional objections to the admissibility of certain cartridges found in his possession during a jailhouse strip search had not been presented to the Nebraska Supreme Court in any form. A federal habeas petitioner must fairly present the substance of any federal habeas corpus claim to the state courts, and thereby provide the state courts with a "fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982). Accordingly, the district court found that Trevino had procedurally defaulted these claims. After careful examination of the trial transcript and of the record on appeal, we find no error in the district court's conclusion that these claims were defaulted and are therefore procedurally barred.

When a petitioner has failed to present the substance of a claim to the state courts, the federal courts are procedurally barred from considering the merits of the claim. *Coleman v. Thompson*, ── U.S. ──, ──, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991). In order to overcome a procedural

bar, a habeas petitioner must demonstrate either "cause and prejudice," *id.; Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), or a "fundamental miscarriage of justice." *Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992); *McCoy v. Lockhart,* 969 F.2d 649, 651 (8th Cir.1992). Trevino made no attempt to demonstrate "cause" and "prejudice" before the district court nor does he do so on appeal. Instead, he focuses on the "fundamental miscarriage of justice" exception to procedural default. He asserts that his due process claims are rooted in "fundamental fairness." Therefore, if the claims are found to be meritorious, Trevino argues that their resolution would automatically result in the correction of a fundamental miscarriage of justice. Trevino contends that this possibility is sufficient to overcome the procedural bar, and to permit the federal courts to consider the merits of his appeal.

We do not agree with this broad interpretation of the "fundamental miscarriage of justice" approach to procedural default. The Supreme Court has repeatedly emphasized the narrow scope of this exception, limiting it almost exclusively to a showing of actual innocence. *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Sawyer,* —— U.S. at ——, 112 S.Ct. at 2519. Trevino cannot meet this stringent standard, and therefore the district court did not err in concluding that these claims were procedurally barred.[1]

### B. Forensic Evidence

■ Trevino claims that the trial court erred when it admitted testimony of Ms. Khreiss, the State's serologist. Khreiss's testimony related to tests she performed on a bloodstain found on Trevino's clothing. Trevino alleges that the procedures Khreiss employed in blood-typing the stain were inadequate and inconclusive. He further alleges that Khreiss failed to perform necessary tests to determine background contamination levels for his clothing. He also complains that Khreiss consumed the entire specimen during her testing, thereby depriving him of the opportunity to conduct an independent analysis.

■ Questions concerning the admissibility of evidence are matters of state law, and are reviewable in federal habeas corpus proceedings only when the alleged error infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process. *Manning–El v. Wyrick,* 738 F.2d 321, 323 (8th Cir.1984). As long as the defendant has an adequate opportunity to impeach the reliability of a scientific test, and the qualifications of the person administering the test, due process is not implicated by a state's good faith failure to preserve a sample for independent testing. *See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

It is undisputed that Trevino had an opportunity, at trial, to rigorously cross-examine Khreiss about perceived flaws in her testing methodology, and to introduce his own expert testimony identifying the inadequacies inherent to that type of testing. Therefore, even assuming that Trevino is correct in his characterization of the testing protocol, we find no deprivation of due process, and Trevino cannot prevail on this claim.

### C. Witness Identification

■ Trevino also assigns error to the trial court's decision to admit the testimony of eyewitnesses who identified him as the perpetrator of the crimes. The incident took place outside of a bar. After the shootings occurred, the gunman fled the area on foot, and a crowd began to gather around the victims in the street. When the police arrived, they parked their cruisers near the scene of the shootings and consequently near the crowd. Trevino was arrested behind a building adjacent to the scene of the crime. He was handcuffed and was escorted to a sheriff's cruiser between two deputies. En

---

1. We note that even if Trevino's expert testimony claim was not procedurally barred, he could not prevail on the merits of this issue. We doubt that such testimony would have been relevant or appropriate in this case. Furthermore, even if we were to find that the expert testimony should have been admitted, and that the trial court erred by excluding it, we do not think this kind of an evidentiary ruling presents an issue of constitutional proportions.

route to the cruiser, the crowd approached the deputies shouting that the officers had arrested the perpetrator. Trevino argues that the witnesses were inevitably influenced by the overly suggestive sight of him being led to a police car in handcuffs by two law enforcement officials. Trevino claims that this "show up" constituted a suggestive pre-trial identification procedure which so contaminated the reliability of the eyewitness identifications that admission of the eyewitness testimony deprived him of due process of law.

A conviction based on eyewitness identification at trial will be set aside only when pre-trial identification procedures were so impermissibly suggestive that they give rise to a very substantial likelihood of irreparable harm.[2] *Manson v. Brathwaite,* 432 U.S. 98, 109–14, 97 S.Ct. 2243, 2250–53, 53 L.Ed.2d 140 (1977); *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The central question is whether, under the totality of the circumstances, the identification was reliable despite any suggestive or inappropriate pre-trial identification techniques. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The factors to consider in evaluating the likelihood of misidentification include: the opportunity a witness has to view the criminal at the time of the crime; the witness's degree of attention; the accuracy of the witness's prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. *Id.* at 199–200, 93 S.Ct. at 382–383.

We have previously held the evaluation of the *Biggers* factors to be a factual determination. *Graham v. Solem,* 728 F.2d 1533, 1542 (8th Cir.), *cert. denied,* 469 U.S. 842, 105 S.Ct. 148, 83 L.Ed.2d 86 (1984). In reviewing a habeas petition from a state court conviction, the federal courts must accord the state court findings of fact a high measure of deference. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curium); *see also* 28 U.S.C. § 2254 (state court factual determinations are entitled to a presumption of correctness on habeas review). The Nebraska Supreme Court considered the *Biggers* factors, and found that the witnesses had an ample opportunity to observe Trevino during a period of at least thirty minutes leading up to the shooting, during the shooting, and immediately following the shootings. *State v. Trevino,* 230 Neb. 494, 432 N.W.2d at 516. The Nebraska court also concluded that several of the witnesses had their attention fixed on Trevino during this time period, though others gave him only passing attention prior to the shootings. *Id.* Additionally, the Nebraska court found that the eyewitnesses who identified Trevino in court exhibited a high degree of certainty in their identifications, and that the time period between the crime and the subsequent confrontation was only about 20 minutes. *Id.*

Reviewing the facts found by the state court, we find that the eyewitness identifications had sufficient indicia of reliability to warrant their admission at trial. Therefore, the admission of that testimony did not deprive Trevino of any constitutional rights.

### D. Sufficiency of the Evidence

Trevino also contends that there was insufficient evidence to support his conviction. We can grant habeas relief only if we find, upon a review of the evidence presented at trial, that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). After a careful review of the entire record, we find that the evidence, though not overwhelming, was more than adequate to support the verdicts.

We have carefully considered Trevino's other contentions and find them without merit.

### III. CONCLUSION

For the reasons discussed above, the decision of the district court denying the writ of habeas corpus is affirmed.

---

2. For purposes of this discussion, we assume, without deciding, that Trevino is correct in his contention that the circumstances of his arrest constituted an impermissibly suggestive pre-trial identification procedure.

HEANEY, Senior Circuit Judge, concurring in part and dissenting in part.

## I.

Juan Trevino was a *17-year-old* Mexican farm laborer at the time Marco Perez was killed and Mark Heil seriously injured. He was married, had an eight-month-old child, and his wife was pregnant with a second child. He had no prior record. He was highly intoxicated at the time of his arrest. Although no motive for the shooting appears in the record, there is evidence that Trevino may have had some past difficulties with Marco Perez. Two law enforcement officials testified for the state that Trevino was drunk when arrested, that he was unaware of his surroundings, and that he was disoriented. Other witnesses testified that he had purchased and drank tequila at the Madrid Lounge where the shootings occurred. There is no satisfactory explanation in the record why the bar sold a minor hard liquor and a six-pack of beer. Fifteen minutes after the shootings occurred, Trevino was seen near the bar. He was arrested, handcuffed, and taken to the jail. He became sick to his stomach and passed out during the process. Notwithstanding Trevino's obvious intoxication, no blood alcohol, urine, or other tests were taken to determine his blood alcohol or chemical level.

Trevino was searched at the scene. No gun or ammunition was found on his person. The gun has not been recovered to this day, although an extensive search of the area was undertaken by law enforcement officials the night of the shooting and the next day. Trevino's hands were tested shortly after his arrest for powder burns. The tests were negative.

Trevino had a companion when he was drinking in the bar, another Mexican farm laborer identified as Alfredo Morales. Just before the two left the bar, Trevino bought a six-pack of beer. It was placed in a paper bag. Both boys walked out of the bar together. The boy carrying the bag handed it to his companion and walked toward the five high school students who had just come out of the bar and were standing by their automobiles. He then shot and killed Marco Perez. Mark Heil, one of the high school students, tackled the shooter, and both the shooter and Mark Heil fell to the ground. During the scuffle the pistol was again discharged, and Mark Heil was severely injured. Both Hispanic boys left the scene. Alfredo Morales was never apprehended. Very little effort was made to locate him. Law enforcement officers waited for at least six days before making any inquiry at the principal employer of the migrant laborers in the Madrid area, and there is no evidence in the record to indicate that efforts were made to trace Morales through friends, relatives, or law enforcement agencies. No Hispanics were interviewed the night of the shooting, and no photo arrays were used in the initial identification process. Officials were satisfied that they had an offender and readily accepted testimony of some eyewitnesses who testified that they saw Trevino with a small pistol in his hand at the time of the shootings, and others who testified that they saw Trevino shoot Marco Perez.[1] They relied principally on hairstyle to identify Trevino. The witnesses stated that Trevino had short hair and Morales had long hair and a beard.[2]

## II.

The principal issues on appeal are whether sufficient evidence was introduced at trial to support each of Trevino's convictions. The critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could

---

1. Two of the witnesses were inside of the bar; one looked out the window and the other looked out the door. They both claim that they saw a small gun in Trevino's hand, and one testified that he saw Trevino fire the gun. Both of these witnesses were regulars in the bar and both had several drinks before the incident occurred.

2. There were many inconsistencies in the eyewitnesses' descriptions of Alfredo Morales. One witness described him as having a long, bushy, full beard. Another described him as having a very, very light mustache. Another witness said he had no facial hair, and still another described him as having a mustache and indicated to the policemen at the scene before Trevino was taken into custody that the gunman had a mustache.

have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89 (1979); *Johnson v. Louisiana,* 406 U.S. 356, 362, 92 S.Ct. 1620, 1624, 32 L.Ed.2d 152 (1972); *Perez v. Groose,* 973 F.2d 630, 634 (8th Cir.1992). Obviously, this standard must be applied to each conviction.[3]

### A. The Second–Degree Murder Conviction

I agree with the majority that the second-degree murder conviction for the death of Marco Perez can stand. On the basis of the evidence, the jury could have acquitted Trevino on this charge, but chose not to do so. Even though the testimony of many of these witnesses was inconsistent, some eyewitnesses testified that they saw a gun in Trevino's hand immediately after Marco Perez was killed, and other witnesses testified that they saw Trevino shoot Marco Perez. To be sure, there was evidence to the contrary. No powder burns were found on Trevino's hands, the gun was never found, no ammunition was found in his possession at the time he was arrested,[4] and his companion was never located. Moreover, the testimony of the two inmates that Trevino had confessed to killing Marco Perez was highly suspect, as was the testimony of an expert that Mark Heil's blood was found on Trevino's jacket. Nonetheless, the eyewitness testimony standing by itself was sufficient, even though the conditions at the time were such that identification was difficult.

### B. Attempted Second–Degree Murder Conviction

After reading the transcript from beginning to end and examining the relevant exhibits, I am convinced that no rational trier of fact could have convicted Trevino for at-

tempted second-degree murder of Mark Heil. The trial court instructed the jury that to convict Trevino on this count, the state must prove the following beyond a reasonable doubt:

1. That the defendant did intentionally engage in conduct which, under the circumstances as he believed them to be, constituted a substantial step in a course of conduct intended to culminate in the following elements of murder in the second degree:

2. That the defendant kill Mark Heil.

3. That he do so intentionally, but without premeditation.

. . . .

On the other hand, if you find that the State has failed to prove beyond a reasonable doubt any one or more of the foregoing material elements, it is your duty to find the defendant not guilty of the charge of attempted murder in the second degree as charged in Count II of the first information.

(R. at T105–06.) The court also instructed the jury with respect to the intent required to find Trevino guilty of attempted murder:

Intent is a mental process and it therefore generally remains hidden within the mind where it is conceived. It is rarely if ever susceptible of proof by direct evidence. It may, however, be inferred from the words and acts of the defendant and from the facts and circumstances surrounding his conduct. *But before that intent can be inferred from such circumstantial evidence alone, it must be of such character as to exclude every reasonable conclusion except that defendant had the required intent.*

---

3. The issue of sufficiency of the evidence with respect to Mark Heil was preserved at every step of the proceedings. A motion to· dismiss all counts of the indictment was made by Trevino's counsel before trial, at the close of the state's case, and at the end of the trial. It was followed by a motion for judgment notwithstanding the verdict. Trevino also raised the issue before the Nebraska Supreme Court, *State v. Trevino,* 230 Neb. 494, 432 N.W.2d 503, 514–15 (1988), and before the district court at the habeas proceeding.

4. When Trevino was first apprehended by the police, they conducted a "pat-down" search of Trevino and no ammunition was found. After Trevino was transported to the jail, the authorities conducted a strip search and twenty rounds of ammunition were found in his sock. There is no explanation in the record as to how law enforcement officers could have missed this ammunition when they searched and cuffed Trevino at the scene of the crime.

(R. at T115 (emphasis added).) Because no objection was taken by either party to these instructions, they constitute the law of the case and are binding on us.[5]

The focus of the trial was on the killing of Marco Perez, and the attempted murder of Mark Heil received little attention during the trial, in closing arguments, or in the briefs filed on appeal. Only five witnesses testified with respect to the Mark Heil incident. Mark Heil testified that he had six beers in a two-hour period preceding the shooting, and that he and Ramon Perez were in the bar with Trevino and Morales. They stayed in the bar ten minutes. After Mark Heil came out of the bar and was talking with his friends, he heard shots being fired. He saw that the skinny Hispanic with short hair had a gun. Heil saw Marco hit, and then he "[j]umped towards the gunman," and that is the last thing he remembers. (R. at 741–42.)

Melissa Heil, the 15–year–old sister of Mark, testified that she had two beers during the evening, and that she went into the Madrid Lounge with her brother Mark and the Perezes. She left the bar with her friends and was standing by the automobile talking. A Mexican with short, dark hair came out of the bar and approached them. He said to Marco, "you know what I'm talking about," and then started shooting Marco. (R. at 724.) She heard more than one sound. Trevino had a gun in his hand, and Mark Heil tried to tackle him. "Then he shot him and he fell." (R. at 726.) She heard one shot.

Ramon Perez, age 18, went into the bar at 12:50 a.m. with the Heils and his brother. They came out of the bar and were standing around the automobiles talking. He saw Trevino come out of the door and hand a sack of beer to his *bearded* companion. Trevino then walked toward Marco and pointed the gun and said, "You'd better get the f*** out of here," *and started shooting.* (R. at 371.) Mark jumped the shooter and they fell onto the sidewalk. *"[W]hen they were doing this* another shot was fired." (R. at 371 (emphasis added).) Mark landed on top of

Trevino and both landed on the sidewalk. All he saw was Mark lying on top of Trevino, and then Trevino just rolled Mark onto his back.

Nicholas Ross testified that he had been in the bar since 10:00 p.m. and had five beers at the most. He said that he heard a "pop" and went to the window. He saw one of the Mexicans holding a pistol toward the high school kids. He then heard two or three more "pops" and saw Marco Perez falling. Ross went on to testify that he saw Mark Heil charge the man firing the gun and both men went backwards out of his view into the vacant lots. "The last thing I saw when they went out of my view was like Mark got his hands on [Trevino's] chest like he was going to shove him, and then I didn't see any more." (R. at 617.)

Jon Gilliland testified that he was sitting in his pickup truck. He saw Mark Heil approach the gunman and a couple more shots were fired. He did not observe Mark Heil tackling Trevino.

On the basis of this testimony, all a rational juror could say was that Mark Heil was shot in a scuffle with Trevino. A juror certainly could not find that this circumstantial evidence was of such a character as to exclude every reasonable conclusion except that Trevino had the required intent to kill Mark Heil. It would be equally reasonable to find that the gun went off accidentally during the struggle. While the testimony may have supported the lesser-included charge of manslaughter, it certainly does not support a charge of attempted second-degree murder, which required the jury to find that Trevino intended to kill Mark Heil.

Trevino's conviction for using a firearm to commit the attempted second-degree murder of Mark Heil must necessarily be voided as well because it was predicated on the attempted second-degree murder conviction. The conviction of Trevino for assault in the first degree of Mark Heil is likewise deficient because it, too, was based on the conviction of Trevino for attempted second-degree mur-

---

**5.** It is not surprising that no objection was made to this instruction because, at least in relevant part, it is a pattern jury instruction from Nebraska, *see* Nebraska Jury Instruction 14.11, that has twice been approved by the Nebraska Supreme Court. *See State v. Beard,* 221 Neb. 891, 381 N.W.2d 170, 174 (1986); *State v. Keeton,* 199 Neb. 405, 259 N.W.2d 277, 280 (1977).

der. Obviously if Trevino had been convicted of the crime of assault in the third degree, that conviction could still stand because the instruction simply required that the bodily injury be caused intentionally, knowingly, *or recklessly*, and that certainly would be the case here.

Under these circumstances, I do not believe we have any alternative other than to remand this matter to the district court with directions to it to void the convictions of Trevino with respect to Mark Heil.