STATE OF NEBRASKA, APPELLEE, V. LAWRENCE E. BEARD, APPELLANT.

381 N.W.2d 170

Filed February 14, 1986.   No. 85-310.

Thomas M. Kenney, Douglas County Public Defender, and Victor Gutman, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

Krivosha, C.J., Boslaugh, White, Hastings, Caporale, Shanahan, and Grant, JJ.

Caporale, J.

Pursuant to the jury's verdict, defendant, Lawrence E. Beard, was adjudged guilty of murder in the second degree and of using "firearms," specifically a knife, to commit a felony. He was thereupon sentenced to imprisonment for a term of 20 years for the murder and to imprisonment for a consecutive term of 5 years for use of the knife. He assigns as error the trial court's (1) failure to suppress the statements he made to Officer James Wilson of the Omaha Police Department, (2) overruling of his objection to the reasonable doubt instruction, and (3) overruling of his objection to the intent instruction. We affirm.

On Tuesday morning, October 9, 1984, at approximately 8:30, Dennis Moody took his child to her babysitter's house and found the latter to be upset over a telephone call she had received concerning her daughter. Moody and two other men then drove to the daughter's house, where they found her 8-year-old son crying and standing in the front doorway of the house. He told them his mother was in her bedroom; upon entering, they saw the daughter lying on the bedroom floor and saw blood on the walls, floor, and bed. Finding that the daughter had no pulse, Moody caused the police to be called.

In the meantime, Seymore Hodges noticed Beard, a friend from their high school days, walking along the street. Since it was raining, Hodges offered Beard a ride. Beard accepted, stating he was going to his girl friend's house, where Hodges then drove. Police officers were already on the scene by the time Hodges and Beard arrived. Sgt. John Thrush, a regional investigator who was in charge of the situation until the homicide detectives arrived, was among the officers present. The homicide detectives, under the supervision of Sgt. Verlyn Sieh, arrived at approximately 9 a.m., after Beard. At various times, friends and relatives of the victim also arrived at the scene. Because of the rain, these people, including Beard, stood under the carport attached to the victim's house. Thrush was of

the opinion that while the men were in the carport, they were being detained until they could be questioned and were not free to leave. Wilson and another officer, on the other hand, believed that Beard and the others were not under arrest at that time and were free to leave. Beard did not believe himself free to leave.

An officer identified Beard to Wilson as a boyfriend of the victim. Wilson reported that fact to Sieh, who told Wilson to "[t]ake him [Beard] down to Central Station to see if he will talk to you." According to Wilson, the police at this point had no reason to believe that Beard was involved in the killing. Wilson stated he then told Beard, "I would like to talk to you at central station. I want to interview you." According to Beard, however, Wilson said, "I want to talk to you downtown." In any event, Beard made no complaint and was driven to police headquarters by Wilson. Beard was not searched, was not handcuffed during the trip, and rode in the front seat of the police cruiser. Taking witnesses to the police station for questioning was stated by Wilson to be normal procedure. Moody and his companions were also driven to headquarters by Thrush for questioning. Hodges, however, drove his own vehicle to the station.

Once at the police station, Wilson took Beard to an interrogation room and, in accordance with Wilson's custom, read Beard his *Miranda* rights at 9:42 a.m.

Although Sieh was also in the room part of the time, Wilson appears to have been primarily responsible for questioning Beard. Beard initially denied any involvement in the crime, but Wilson did not believe him. While denying involvement in the crime, Beard admitted he had lived with the victim on and off but said he had not been staying with her recently because they had been having problems which centered around the victim's use of narcotics and alcohol. It was because Beard did not want his 2-year-old son, who had been borne by the victim, exposed to such activity that he removed the boy from the victim's house. Beard also admitted he had been at the victim's house the night before her body was found. At some point another officer informed Wilson that the victim's 8-year-old son saw the arm of a man closing the door to his mother's bedroom Monday night

and recognized the man's voice as belonging to Beard. At another point, the record does not reveal when, Wilson told Beard that blood had been found on the latter's watch which Wilson had taken out of the interrogation room on an earlier occasion. In fact, no blood had been found on the watch. Wilson also told Beard he felt sorry for him, having to live with a woman like the victim, and that it was "best to tell the truth and get the thing over with."

Beard confessed at approximately 2:30 p.m. to having stabbed the victim. Following this, he took Wilson and another policeman to the place he claims to have hidden the clothes he had been wearing that night, as well as the knife and a telephone cord. However, none of these items were found. Beard then gave a tape-recorded statement.

In this statement, which was played for the jury at Beard's trial, Beard again described the crime and talked at length about arguments he had had with the victim.

Beard related that on Monday evening he saw a man enter the victim's house. He listened to their conversation from outside and then went back to his mother's house and got a 5-inch butcher knife. After the football game on television was over, he returned to the victim's house. When no one answered the door, he entered by hitting it with his shoulder. The victim denied that another man had been there. Beard then stabbed her in the leg; she continued her denials and slapped and kicked Beard, and he stabbed her again. Beard then washed his hands in the bathroom sink and left. At that time the victim was still talking and breathing.

The victim died from loss of blood due to multiple stab and cut wounds.

Beard's first assignment of error rests upon the trial court's overruling of his pretrial and trial motions to suppress the statements he made to Wilson.

The fourth amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution provide, "The right of the people to be secure in their persons . . . against unreasonable . . . seizures shall not be violated . . . ." The issue raised by Beard's first assignment of error, therefore, is whether the police, lacking probable cause to arrest Beard, unreasonably seized

him, thereby rendering the confession he made while so seized inadmissible in evidence.

The first question encountered in the analysis of this issue obviously is whether there was any seizure of Beard at all. *State v. Horn*, 218 Neb. 524, 357 N.W.2d 437 (1984), and *State v. Longa*, 211 Neb. 356, 318 N.W.2d 733 (1982), in reliance upon the opinion of Justices Stewart and Rehnquist in *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), concluded that a person is "seized" only when, by means of physical force or a show of authority, his or her freedom of movement is restrained. However, the more recent case of *INS v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984), indicates that an impermissible seizure has taken place if the circumstances of the encounter with the police are so intimidating as to demonstrate that a reasonable person would have believed himself or herself not free to leave.

In *Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979), a police detective, after questioning an informant about an attempted robbery and murder "in the hope that something might turn up," *id*. at 218, ordered other detectives to "pick up" Dunaway and "bring him in," *id*. at 203, notwithstanding the fact that at that time no probable cause to arrest him existed. Dunaway was then located at a neighbor's house, taken into custody, and driven to police headquarters. Although he was not informed he was under arrest, he would have been physically restrained had he attempted to leave. The U.S. Supreme Court, based upon the finding of the state court that Dunaway had not accompanied the police voluntarily, ruled that an unconstitutional seizure had taken place. As a consequence, the incriminating statements Dunaway made after being placed in an interrogation room and given his *Miranda* warnings were held to be inadmissible in evidence.

Whether Beard voluntarily accompanied Wilson to police headquarters by not protesting and thus was not seized is a question of fact. Implicit in the trial court's rulings is the finding that Beard consented to make the trip to police headquarters. It is well established that this court will not overturn the trial court's findings of fact when determining the

correctness of the latter's rulings on motions to suppress unless those findings are clearly wrong. *State v. Horn, supra; State v. Walmsley*, 216 Neb. 336, 344 N.W.2d 450 (1984). Thus, the question at this point in the analysis becomes whether it can be said that the trial court's finding was clearly wrong. It cannot be so said.

The fact that Beard considered himself not free to leave is immaterial, for it was not necessary that he know or have been told he had a right not to accompany Wilson. *INS v. Delgado, supra*. See, also, *State v. Packett*, 207 Neb. 202, 297 N.W.2d 762 (1980), and *State v. Wood*, 195 Neb. 353, 238 N.W.2d 226 (1976), which hold that one asked to consent to a search need not know or be told that he or she may refuse.

It is true that one's initially consensual encounter with the police may be transformed into an unreasonable seizure or detention by subsequent events. *Dunaway v. New York, supra*. However, in the absence of evidence that Beard gave any manifestation while being questioned that he sought to revoke his earlier consent, it cannot be said the trial court's implied finding that he did not later withdraw his consent is clearly wrong. It became clear during questioning that Wilson did not believe Beard was innocent of the crime, yet at no time did Beard ask that questioning stop and he be released.

Consequently, the trial court's finding that Beard's failure to protest rendered the trip to police headquarters consensual cannot be said to be clearly wrong, and Beard's first assignment of error therefore fails.

Beard next complains that in connection with the State's burden of proof, the trial court instructed the jury in the words of the pattern instruction known as Nebraska Jury Instruction 14.08. Specifically, Beard moved to strike the italicized language in the following recitation of that instruction:

"Reasonable doubt" is such a doubt as would cause a reasonable and prudent man, in one of the graver and more important transactions of life, to pause and hesitate before taking the represented facts as true and relying and acting thereon. It is such a doubt as will not permit you, after full, fair, and impartial consideration of all the evidence, to have an abiding conviction, to a moral

certainty, of the guilt of the accused. At the same time absolute or mathematical certainty is not required. *You may be convinced of the truth of a fact beyond reasonable doubt and yet be fully aware that possibly you may be mistaken. You may find an accused guilty upon the strong probabilities of the case, provided such probabilities are strong enough to exclude any doubt of his guilt that is reasonable.* A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the state, *as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.*

He argues that the subject language "unconstitutionally weaken[s] the burden of proof placed on the prosecution." Brief for Appellant at 20-21. While there is authority suggesting it is perhaps better not to attempt to define "reasonable doubt" at all, some of that authority nonetheless rejects a per se rule that such an attempt requires reversal of a conviction. *United States v. Moss*, 756 F.2d 329 (4th Cir. 1985); *United States v. Regilio*, 669 F.2d 1169 (7th Cir. 1981), *cert. denied* 457 U.S. 1133, 102 S. Ct. 2959, 73 L. Ed. 2d 1350 (1982). *Moss* upheld an instruction requiring proof of such a convincing character that jurors would be willing to rely upon it without hesitation in their most important affairs. *Regilio* criticized but found harmless an instruction defining reasonable doubt as doubt based on reason. However, *United States v. Wosepka*, 757 F.2d 1006 (9th Cir. 1985), found defective an instruction defining reasonable doubt as doubt based on reason and common sense, without tying it to a requirement that jurors decide the question of guilt or innocence with the same degree of care and attention they would bring to bear in the most important of their own personal affairs.

In effect, Beard invites us to overrule *State v. Anderson and Hochstein*, 207 Neb. 51, 296 N.W.2d 440 (1980), *cert. denied* 450 U.S. 1025, 101 S. Ct. 1731, 68 L. Ed. 2d 219 (1981), which specifically approved NJI 14.08 and rejected an argument that it is "confusing, contradictory, and a misstatement of the traditional understanding of 'reasonable doubt'." *Id.* at 69, 296

N.W.2d at 452. The invitation is rejected, for, unlike the situation in *Wosepka*, NJI 14.08 makes clear that a reasonable doubt exists if the uncertainty is such that in one of the graver and more important transactions of life, a reasonable and prudent person would hesitate to accept the represented facts as true and in relying and acting upon them.

In his third and last assignment of error, Beard contends the trial court erred in not striking, pursuant to his motion, the italicized language in Nebraska Jury Instruction 14.11:

> The intent required by Instruction \_\_\_\_ is a material element of the crime charged against the defendant. *Intent is a mental process and it therefore generally remains hidden within the mind where it is conceived. It is rarely if ever susceptible of proof by direct evidence. It may, however,* be inferred from the words and acts of the defendant and from the facts and circumstances surrounding his conduct. But before that intent can be inferred from such circumstantial evidence alone, it must be of such character as to exclude every reasonable conclusion except that defendant had the required intent. It is for you to determine from all the facts and circumstances in evidence whether or not the defendant committed the acts complained of and whether at such time he had the criminal intent required by Instruction \_\_\_\_. If you have any reasonable doubt with respect to either, you must find the defendant not guilty.

Beard further moved that in place of the stricken language the words "Intent can" be inserted so that the second sentence would read: "Intent can be inferred from the words and acts of the defendant and from the facts and circumstances surrounding his conduct."

His contention is that somehow the language of the pattern instruction at issue constitutes an argument for the prosecution. The situation is in fact quite to the contrary.

It is true that in *Francis v. Franklin*, \_\_\_\_ U.S. \_\_\_\_, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985), the U.S. Supreme Court declared invalid instructions which presumed acts to be the product of one's will and presumed that one intended the natural and probable consequences of those acts, but stated

that such presumptions might "be rebutted." The Court held the instructions violated the fourteenth amendment requirement that a state prove beyond a reasonable doubt every element of a crime. *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), also invalidated an instruction which stated the law presumed one intends the ordinary consequences of an act. NJI 14.11, however, makes no presumptions; rather, it accurately describes the nature of intent and describes how it is proved, leaving the jury free to determine whether the defendant committed the acts in question and possessed the requisite criminal intent.

We adhere to our prior approvals of NJI 14.11. *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981); *State v. Keeton*, 199 Neb. 405, 259 N.W.2d 277 (1977).

Each of Beard's assignments of error being without merit, the judgment of the district court is affirmed.

AFFIRMED.

WHITE, J., concurs in the result.