STATE OF NEBRASKA, APPELLEE, V. CHARLES E. LACHAPPELL, APPELLANT.

382 N.W.2d 343

Filed February 28, 1986.    No. 85-421.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger, for appellant.

Robert M. Spire, Attorney General, and Bernard L. Packett, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

Defendant, Charles E. LaChappell, appeals his manslaughter conviction, following a bench trial, on the ground that certain statements he made to the police were improperly received in evidence. We affirm.

At 2:30 p.m. on September 10, 1984, Penny Fortner left the care of her 5-month-old daughter with defendant, her boyfriend, while she went out to do some shopping. The infant was teething and therefore irritable, but was sleeping when Fortner left. Fortner told her sister, Connie Buck, who lived next door, that the infant was with defendant, but asked her to check as well.

Approximately 5 minutes after Fortner's departure, Buck sent her boyfriend, Royce Maloney, next door to check. No one responded to Maloney's knock on the door, and he returned to Buck's house. Five minutes later, defendant ran up Buck's stairway, yelling and carrying the infant, who was unconscious and blue, and explained that she had choked on her bottle. Maloney held the infant upside down with one hand while shaking her up and down and patting her on the back in an attempt to dislodge any obstruction. While efforts were being made to revive the infant, defendant went next door to call an ambulance, and he then accompanied the infant to the hospital.

Fortner returned to her home at about 4 p.m., learned her

daughter was in the hospital, and went there. Defendant remained at the hospital for about half an hour after Fortner's arrival and then returned to the latter's house. At approximately 11 p.m. the police arrived at the hospital to question Fortner.

At approximately 1:30 a.m. Paul Wade, a police officer in the homicide and assault unit, received telephone instructions from Sgt. Verlyn Sieh to go to the hospital and investigate the assault on Fortner's daughter.

Between 2:30 and 3 a.m., Wade asked Fortner to call defendant and ask him to come to police headquarters so the police could talk to him. Fortner telephoned defendant, who replied he did not want to come to headquarters, since he was sleeping. Fortner, however, told him that the police would come and get him. According to Fortner, Wade never talked to defendant over the telephone, but Wade said he did when it became clear that defendant was questioning Fortner. Wade told defendant they had a number of questions they wanted to ask him and wondered if he would come to police headquarters. Defendant replied he had no transportation, and Wade offered to pick him up, to which defendant agreed. Wade drove to Fortner's residence, and defendant came out of the house and got into the front seat of the police car. From that point on, defendant did not feel he was free to leave.

Upon arriving at headquarters a few minutes later, Wade took defendant to an 8- by 10-foot windowless room on the fourth floor. Between 3 and 3:15 a.m., Wade and Sieh entered the interrogation room to question defendant. At this time the police were aware that the infant had a serious head injury, but, according to Wade, defendant was not yet a suspect and was not then under arrest; therefore, he was not given the *Miranda* warnings. Defendant told the two officers that he had given the infant a bottle and that she suddenly had a seizure and stopped breathing.

Wade then left the room to ask Fortner some further questions. Upon returning to the room, Wade informed defendant that the infant was suffering from a severe head injury. After defendant replied that the infant had not hit her head while he had been alone with her, Wade, at 4:28 a.m., gave

defendant the *Miranda* warnings. According to Wade, defendant was nonetheless still free to leave at that time.

Upon further questioning, defendant said perhaps the infant had hit her head on a railing at Buck's house when he ran up the stairs with her. Defendant then gave the police a taped statement in which he stated that 20 minutes after Fortner left, he laid the infant down in her crib. She began fussing, so he brought her back into the living room and gave her a bottle. About 15 minutes later she arched her back and stopped breathing. He tried to revive her by performing mouth-to-mouth resuscitation, but realizing he did not know the proper procedure, ran next door to Buck's house, carrying the infant under his left arm with her head pointed forward. As he ran up Buck's steps, the infant hit her head on the railing. According to defendant, he had not mentioned this before, even though he had been told the infant had a severe head injury, because he did not think the contact with the railing was that hard.

After talking with Sieh outside the interrogation room, Wade asked Officer Subby Salerno to subject defendant to a polygraph examination. Salerno wanted to wait a day or two before conducting such an examination so that he could review the reports and so that defendant would be better rested. However, Wade convinced Salerno to proceed at that time, since, in Wade's view, enough evidence to show that a crime had been committed did not exist. Wade feared that if defendant were to leave, the police might have difficulty getting him back. Defendant agreed to the polygraph examination, and at 7:15 a.m. Wade turned defendant over to Salerno.

At 7:30 a.m. Salerno had defendant execute a "Polygraph Rights Advisory Form" which, among other information, contained the *Miranda* warnings. Defendant claims he was told if he passed the test, he could then leave. Defendant stated that after he was asked six or seven questions, he removed the apparatus from his fingers and from around his waist, told Salerno "the test was over," and refused the request to submit to a further polygraph examination. According to Salerno, the questions asked during the polygraph examination included inquiries into whether defendant knew how the infant sustained

injury to her head, whether the infant really hit her head on a railing, whether the injury was sustained while in Fortner's residence, whether defendant intentionally injured the infant, and whether defendant was purposely attempting to withhold information. Salerno agreed that the polygraph examination was incomplete, as only one set of questions was posed to defendant. Usually, if but one set of questions is used, it is because the subject refused to answer a second set. Salerno therefore agreed that defendant may have refused to complete the examination, but did not have a specific recollection to that effect. Salerno was with defendant in the polygraph examination room for less than half an hour.

Defendant also claims Salerno told him he had failed the examination and continued to question him about the incident. Salerno, on the other hand, could not remember whether he told defendant he had failed the examination, but did think defendant was being deceitful. Salerno did not recall questioning defendant further after he refused further participation in the polygraph examination. However, defendant did orally admit to Salerno that the infant had become unruly and that he had shaken her to stop her from crying. Salerno took defendant back to the original interrogation room and at approximately 8:40 a.m. informed Wade of defendant's foregoing admission.

Defendant was again given the *Miranda* warnings, after which he first orally repeated to Wade the admission he first made to Salerno and then restated it once again so that it could be tape recorded. In the recorded admission defendant added that he had reached underneath the infant's arms and shaken her for 10 to 15 seconds, during which the infant's head bobbed back and forth. When he laid her down, she stopped breathing.

According to Wade, defendant requested an attorney for the first time after he gave the aforesaid recorded admission. Defendant, on the other hand, claims he asked for an attorney when the police first began questioning him. The testimony is also in conflict as to whether the door to the interrogation room was locked. Salerno testified he did not know whether the door was locked, and Wade testified that neither he nor Sieh ever locked the door. However, defendant stated he tried to open the

door after first being placed in the interrogation room and at various other times and always found it locked.

The infant died as the result of brain damage due to vigorous shaking, but not as a consequence of Maloney's efforts to revive her. The police learned of the infant's death between 11 and 11:30 a.m. on September 11, 1984.

The trial court found that defendant was the focus of the police investigation at least by the time he was given the *Miranda* warnings at 4:28 a.m., specifically finding that the door to the interrogation room had been locked by that time. The court then found that as of 4:28 a.m., defendant was "under arrest and that the arrest was not legal." Nonetheless, the trial court received in evidence, over a motion to suppress, all the statements defendant made to the police except for the oral and recorded admissions he made to Wade after his first admission to Salerno that he had shaken the infant when she became unruly.

The first issue to be resolved is whether there was a seizure and, if so, whether it was unreasonable. These are both factual questions. *State v. Beard,* 221 Neb. 891, 381 N.W.2d 170 (1986); *Wilson v. Gutschenritter,* 185 Neb. 311, 175 N.W.2d 282 (1970). In reviewing the trial court's determinations with respect thereto, we are bound by the rule that this court will not overturn the trial court's factual findings when determining the correctness of the latter's rulings on the suppression of evidence unless those findings are clearly wrong. *State v. Beard, supra.*

It has been determined that one who voluntarily accompanies the police for questioning has not been seized. It has also been said, however, that one's initially consensual encounter with the police may be transformed into a seizure or detention by subsequent events. A seizure takes place if the circumstances of an involuntary encounter with the police are so intimidating as to demonstrate that a reasonable person would have believed himself not free to leave. *State v. Beard, supra.*

The trial court's finding that defendant was seized, that is, that a reasonable person would not have believed himself free to leave, by 4:28 a.m. at the latest is supported by the evidence and is not clearly wrong.

The trial court's finding that the seizure was unreasonable, that is to say, without probable cause at that time, is, however, another matter.

Probable cause to seize an individual exists at the moment the collective knowledge and trustworthy information of all the police officers engaged in a common investigation are such as to warrant a conclusion by a prudent person that the individual seized committed a felony. See, *State v. Harrison*, 218 Neb. 532, 357 N.W.2d 201 (1984); *State v. Hack and Callans*, 212 Neb. 406, 322 N.W.2d 806 (1982). It is not required that an officer see the commission of the felony, nor does the finding of probable cause require the same specific evidence of each element of the offense as would be needed to support a conviction. *State v. Hack and Callans, supra.* By the time of the seizure as found by the trial court, the police knew that defendant had been alone with the child, that during that period of time something took place which, according to the defendant, caused the infant to stop breathing and caused the defendant to become sufficiently concerned about the infant's well-being to run with her to the Buck home, that the infant had some type of head injury, and that the defendant's explanation that the infant had choked on her milk was apparently false. There was at that time, therefore, probable cause to believe that at the very least defendant had committed an act of child abuse in violation of Neb. Rev. Stat. § 28-707 (Cum. Supp. 1984), a felony if committed knowingly and intentionally.

The fact that Wade did not appear to appreciate the fact that probable cause to seize defendant existed does not alter the reality of the situation. The trial court's finding that the seizure was unreasonable is clearly wrong.

The question thus becomes not whether the one incriminating statement received in evidence, defendant's admission to Salerno that he had shaken the child when she became unruly, was the result of an unreasonable seizure but, rather, whether it was obtained as the result of impermissible incustody interrogation.

Once an individual in custody indicates in any manner, at any time prior to or during questioning, that he or she wishes to remain silent, interrogation must cease, for at this point the

individual being interrogated has shown that he or she intends to exercise his or her fifth amendment right to remain silent. *State v. Perkins*, 219 Neb. 491, 364 N.W.2d 20 (1985); *In re Interest of Durand. State v. Durand*, 206 Neb. 415, 293 N.W.2d 383 (1980); *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Moreover, once the right to remain silent has been invoked, there is a strong presumption against its subsequent waiver. *State v. Joy*, 218 Neb. 310, 353 N.W.2d 23 (1984). However, the police are not required to accept as conclusive any statement or act, no matter how ambiguous, as a sign that a suspect desires to cut off questioning. *State v. Perkins, supra*.

The trial court found that while defendant terminated the polygraph examination, he did not terminate his conversation with Salerno. We cannot say that finding of fact is clearly wrong. By his own words the defendant said not, "I am through talking," or "I am through answering questions," but that "the *test* was over." (Emphasis supplied.) The best that can be said from defendant's point of view is that his utterance is ambiguous as to whether he meant that he did not wish to say anything else at all. That ambiguity, however, was resolved against him by the trier of fact, and, thus, the incriminating admission defendant made to Salerno that he shook the infant was properly admitted in evidence.

The record failing to sustain defendant's assignment of error, the judgment of the trial court is affirmed.

AFFIRMED.