STATE OF NEBRASKA, APPELLEE, V. JEREMY P. OSBORN,
APPELLANT.

547 N.W.2d 139

Filed May 10, 1996.   No. S-95-721.

J. William Gallup, of Gallup & Schaefer, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

LANPHIER, J.

Jeremy P. Osborn appeals his convictions in the Douglas County District Court for first degree murder and use of a weapon in the commission of a felony. The primary issue raised is whether Osborn's confession should have been suppressed as the poisonous fruit of an illegal seizure. Osborn maintains that he was subjected to illegal seizure and custody without probable cause and that the confession was the result of same. Osborn also asserts that his confession should be sup-

pressed because it was not freely and voluntarily made. The district court denied Osborn's motion to suppress his confession. The confession was introduced into evidence at the bench trial. Osborn's sole assignment of error is that the district court erred in overruling the motion to suppress. We affirm.

## BACKGROUND

On December 13, 1993, Laura Gogan was found dead in her southwest Omaha apartment by her roommate. Gogan was a 19-year-old student at the University of Nebraska at Omaha. Gogan had suffered multiple lacerations and stabs to her neck. Her death was caused by asphyxiation in association with those wounds. The autopsy revealed that Gogan had engaged in sexual relations prior to her death.

The Omaha Police Division launched an extensive investigation into the crime. Gogan's friends and neighbors in the apartment complex were interviewed. Osborn lived with his father, Michael Osborn, in the same apartment complex as Gogan. At the time, Jeremy Osborn was a 19-year-old student attending Metropolitan Community College in Omaha.

Officers James Wilson and William Jadlowski, detectives with the Omaha Police Division, received information that Michael Osborn was concerned that his son might be connected with the murder. Wilson testified that they were unable to verify this information through the source, so they decided to interview the father and son directly. The officers began trying to contact the Osborns on Friday, December 17, and continued to attempt to contact them throughout the following weekend.

The officers had learned that the father had a job with a construction company. They decided to try to contact the Osborns early Monday morning in order to catch them before the father went to work. The officers did not have a warrant for Osborn's arrest because they did not believe that they had probable cause to charge him with Gogan's murder.

Officers Wilson and Jadlowski knocked on the Osborns' door at 6:30 a.m. The father answered the door, and the detectives identified themselves as police officers. The officers told

the father that they wanted to speak to him and his son in regard to the Gogan murder. The officers asked the father if he and his son would come to Omaha police headquarters to be interviewed. The father said that his son was sleeping, but that he would wake him up.

Osborn testified that his father woke him up and told him that they were going to go to the police station to talk about Gogan's murder. The father testified that his son did not voice any objection to going to the police station. The Osborns followed Wilson and Jadlowski to the police station in their own car.

Osborn admitted that he went to the police station voluntarily and that he was willing to cooperate with the police at that time.

At police headquarters, Officers Wilson and Jadlowski showed the Osborns where to park and then met them at the front door. The officers took the Osborns to the criminal investigation bureau, located on the fourth floor. The officers told the Osborns that they wanted to interview both of them, beginning with the father. Jadlowski testified that they routinely interview people separately so that one person's answer does not influence the other person's response. At approximately 7 a.m., Wilson placed Osborn in a small interview room by himself and Jadlowski led the father to another interview room.

Officers Wilson and Jadlowski began interviewing the father at approximately 7:10 a.m. The father confirmed that he was suspicious about his son's possible involvement in the homicide. Upon learning that the father had discussed his suspicions with Paula Powell, his former wife and his son's mother, the police contacted Powell and asked her to come to police headquarters. Both parents were questioned until about 10 a.m. At that point, the officers told the parents that they were ready to interview their son.

While his parents were being interviewed, Osborn had remained in his interview room. The interview room was approximately 10 by 12 feet and contained a table and several office chairs. Osborn's testimony regarding his 3-hour wait in the interview room differs substantially from that of the

Omaha police officers who were responsible for monitoring him.

Officer Wilson testified that when he placed Osborn in the interview room, he left the door open. Lt. Donald Thorson testified he had instructed his staff that witnesses and suspects should not be locked into interview rooms unless they had been placed in custody. Thorson produced an internal memo dated October 13, 1993, and the minutes of a staff meeting conducted on October 21. These documents disclose that the locked door policy was announced and discussed. In order to enforce this policy, the locks on the interview room doors were taped over.

Lieutenant Thorson instructed his staff that they were to document all contacts they had with a witness or suspect. The staff was further instructed to check on people waiting in interview rooms about every 20 to 30 minutes and offer an opportunity to use the restroom and to have something to drink. Thorson had a log developed so that the officers could record such contacts.

Sgt. Michael Butera testified that he checked on Osborn periodically on the morning of December 20. Butera recorded each of his visits in a small spiral notebook. According to his notes, Butera checked on Osborn at 7:55, 8:05, 8:10, 8:20, 8:40, 9, and 9:20 a.m. Butera stated that at 7:55, another officer had just finished recording Osborn's biographical data and that the door to the interview room was open. Butera testified that he offered Osborn the opportunity to use the restroom and to have something to drink each time he went to check on Osborn. Butera testified that Osborn generally appeared to be resting or sleeping, with his head down on top of his crossed arms. Butera testified that he closed the door each time he checked on Osborn, because the hallway tended to be somewhat noisy. Butera stated that the interview room was not locked.

Officer Kathryn Hearn testified that she interviewed Osborn from 7:15 to 7:40 a.m. in order to obtain background information, such as date of birth, employment, school, et cetera. Hearn testified that she checked on Osborn at 8:15, 8:45, and 9:30 a.m. Hearn stated that she left the interview room door

open after her 8:15 check, but that at 8:45, she found the door closed. Hearn testified that the door was never locked and that it was impossible to lock the door because the deadbolt had been taped over. Hearn also stated that she walked past the room several times and observed Osborn sleeping with his head down on the table.

Lieutenant Thorson produced the logsheet which purported to document the number of times that Osborn was checked on during his 3-hour wait in the interview room. The log indicates that Officer Hearn obtained Osborn's biographical data from 7:15 to 7:40 a.m. The log also states that Hearn checked on Osborn at 8:15, 8:45, and 9:30 a.m. The log does not contain any record of Sgt. Butera's visits. Butera admitted that he had violated department policy requiring him to use the official log to document checks on witnesses and suspects waiting in interview rooms.

Osborn testified that after Officer Wilson placed him in the interview room, Wilson shut the door. Osborn said that Officer Hearn came in shortly after 7 a.m. and obtained biographical information. Osborn said that this was the only time during the 3 hours that he was in the room that the door was opened. Osborn testified that he was tired and spent the time trying to sleep. Osborn testified that after being in the room for some time, he wanted to use the restroom, but found that he had been locked in. Osborn said that he did not feel like he was free to leave, because the door was locked. Osborn admitted that the police did nothing to make him feel uncomfortable other than purportedly lock him in the interview room.

As stated above, Officers Wilson and Jadlowski finished their interviews with Osborn's parents at around 10 a.m. At that point in time, Wilson still did not believe that probable cause existed to arrest Osborn.

Officer Wilson testified that he went to the interview room where Osborn was waiting, found the door open, and then escorted Osborn to another interview room. Wilson told Osborn that he wanted to talk to him about Gogan's death. Wilson then read Osborn the standard *Miranda* rights advisory form. Osborn was advised that he had the right to remain

silent, that anything he said could and would be used against him in court, that he had the right to consult with a lawyer and have a lawyer present during questioning, and that a lawyer would be appointed if he could not afford one.

Osborn testified that when Officer Wilson came to get him, he did not ask to use the restroom, although he had earlier testified that he had wanted to during his 3-hour wait. Osborn testified that Wilson had read him his *Miranda* rights and that he understood those rights. Osborn testified that he agreed to cooperate and to talk with the police, freely and voluntarily. Osborn testified that no use of force, threats, or trickery was employed.

Officers Jadlowski and Wilson testified that Osborn appeared coherent, polite, and cooperative when he was read his rights. At first, Osborn denied killing Gogan. Then Osborn began to get nervous and cry. Jadlowski testified that Wilson put his arm around Osborn and told him it would be better for Osborn to talk about it. Wilson said something to the effect that Osborn was a victim of circumstances and that this thing just happened. Osborn then confessed to the murder.

At 11:08 a.m., Osborn was read his *Miranda* rights a second time and he was asked to give a formal, taped interview. In the interview, Osborn stated that he had encountered Gogan in the apartment complex's parking lot on December 13 and claimed that she asked him up to her apartment. Osborn stated that he and Gogan engaged in consensual sex, but that when they were finished, Gogan became upset and threatened to report him for rape. Osborn went into the kitchen, got a butcher knife, and stabbed Gogan in the neck several times. Osborn put the knife in the dishwasher and started the wash cycle. Osborn took some tuna, soda, and Pop-Tarts from the kitchen and left.

Evidence taken from the crime scene contradicted some of Osborn's testimony. First, the door to Gogan's apartment appeared to have been pried open. Second, after the murder, Gogan's roommate was asked to look around the apartment to see if anything was missing. The roommate discovered that some of Gogan's underwear had been placed in the room-

mate's underwear drawer and that her underwear had been riffled through and unfolded.

Osborn was charged with murder in the first degree, Neb. Rev. Stat. § 28-303 (Reissue 1995). The information alleged that he did purposely and with deliberate and premeditated malice, or during the perpetration of, or attempt to perpetrate, a sexual assault in the first degree or burglary, kill Gogan. The information also charged Osborn with a violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1989), the offense of use of a knife to commit a felony.

Osborn entered a plea of not guilty and waived his right to a speedy trial. On September 16, 1994, Osborn filed a motion to suppress his statements and all evidence derived from those statements. In his motion to suppress, Osborn asserted:

> The Defendant moves the Court for an order suppressing the statements taken from him by Omaha Police Officers and all evidence derived from those statements for the reason that the Defendant was placed in a locked room at the Omaha Police Station without any probable cause and held for two (2) hours prior to being questioned; that the locking of the Defendant in a room without an arrest warrant and without any probable cause constituted an illegal arrest; and all the statements taken subsequent to that arrest and all evidence derived from those statements are inadmissible due to the initial illegal arrest and illegal detention of the Defendant.

The hearing on the motion to suppress was conducted on September 28 and November 2, 1994. On November 16, the district court entered a summary order overruling Osborn's motion to suppress. In its entirety, the order states, "Defendant's motion to suppress is overruled."

Osborn waived his right to a jury trial, and trial before the bench was conducted on January 12, 1995. The defense entered into a stipulation allowing the admission of police reports and witness statements. The defense objected to the admissibility of Osborn's confession "for the reasons made to the Court prior to trial and repeated here; specifically, that the statement was involuntary; that it was a fruit of an illegal

arrest and other reasons advanced prior to trial." The district court overruled the defense's objections.

On January 13, 1995, the court announced its verdict. The court found Osborn guilty of count I, first degree murder, and count II, use of a knife in the commission of a felony. Sentencing before a three-judge sentencing panel was set. On June 15, the panel sentenced Osborn to life imprisonment for count I, the crime of murder in the first degree. The district court individually imposed a sentence of not less than 10 nor more than 15 years' incarceration for count II, such sentence to run consecutively to the life sentence. On June 28, Osborn timely filed his intent to appeal the judgments and sentences.

## ASSIGNMENT OF ERROR

Osborn asserts that the district court erred in overruling his motion to suppress his statements.

## STANDARD OF REVIEW

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings of fact are clearly erroneous. In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994). See, also, *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994), cert. denied ____ U.S. ____, 115 S. Ct. 2279, 132 L. Ed. 2d 282 (1995); *State v. Ranson*, 245 Neb. 71, 511 N.W.2d 97 (1994).

Determinations of whether there was a seizure and, if so, whether it was unreasonable are both factual questions. *State v. LaChappell*, 222 Neb. 112, 382 N.W.2d 343 (1986); *State v. Beard*, 221 Neb. 891, 381 N.W.2d 170 (1986).

## ANALYSIS

### OSBORN NOT SEIZED

Osborn argues that he was seized within the meaning of the Fourth Amendment to the U.S. Constitution when he was placed in the locked interview room for 3 hours before being

interrogated. Osborn states that in view of all the circumstances surrounding the incident, a reasonable person would not have believed that he or she was free to leave.

Osborn states that he was a 19-year-old with no prior experience with law enforcement officers. Osborn asserts that he was awakened at 6:30 a.m., locked in a room, and given no opportunity to consult with his parents, although they were in an adjoining room. Osborn highlights the failure of Sgt. Butera to log his checks on the interview room as required by department policy and asserts that the testimony of Butera and Officer Hearn regarding the open/shut door was inconsistent. No one advised him that he was free to leave; therefore, Osborn concludes that he was not free to leave. For the foregoing reasons, Osborn asserts that he was illegally detained prior to giving his confession and that such confession is inadmissible as "fruit of the poisonous tree."

Although Osborn concedes that his assertion that he was locked in the interview room is contradicted by all other evidence, he asserts that his testimony was credible, because he had no reason to lie. Defense counsel asserts that Osborn was not aware of the legal ramifications of the locked door and that the term "probable cause" meant as much to Osborn "as the formula $E=MC^2$ means to O.J. Simpson." Brief for appellant at 10-11. Osborn's brief concludes with the statement that "[c]ounsel for the appellant still thinks that appellant's version of the facts, supported by other evidence, is as honest, truthful and trustworthy as the supplications of a monk bent over a Bible illuminated by flickering candles. The confession should have been suppressed." Brief for appellant at 15.

Under our standard of review, we will not overturn the district court's factual findings unless they are clearly wrong. Here, Osborn invites this court to judge the honesty and credibility of the witnesses despite the fact that our standard of review precludes us from reweighing the evidence or resolving conflicts in the evidence.

Appeals can be quickly, and are more likely to be accurately, resolved when the trial court's order regarding motions to suppress contains specific findings of fact. However, there is no statutory or other requirement that a court make specific

findings of fact and conclusions of law in an order denying or granting a motion to suppress. We have held that Neb. Rev. Stat. § 25-1127 (Reissue 1995), which requires that upon request a court "state in writing the conclusions of fact found separately from the conclusions of law," does not apply to criminal cases. See, *State v. Dake*, 247 Neb. 579, 529 N.W.2d 46 (1995); *State v. Franklin*, 241 Neb. 579, 489 N.W.2d 552 (1992). However, we have also stated that faced with a timely request, a judge sitting as a trier of fact may state in writing the conclusions of fact separately from the conclusions of law. *State v. Secret*, 246 Neb. 1002, 524 N.W.2d 551 (1994).

Neither Osborn nor the State requested any specific findings of fact or conclusions of law. The fact that no statute may require an articulation of the factual conclusions and legal reasoning upon which the denial of a motion to suppress is based does not mean that other considerations demand that such be done.

A review of several recent cases demonstrates how essential findings of fact have been in the conduct of our review. See, e.g., *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994); *State v. Ranson*, 245 Neb. 71, 511 N.W.2d 97 (1994); *State v. Harris*, 244 Neb. 289, 505 N.W.2d 724 (1993). In other cases, we found that certain findings of fact were implicit in the lower court's decision. See, e.g., *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993) (although no specific finding was made regarding location of controlled substance in relationship to defendant, that finding was unimportant because either alternative finding supported conclusion that defendant was in possession of controlled substance); *State v. Morrison*, 243 Neb. 469, 500 N.W.2d 547 (1993) (implicit in trial court's denial of motion to suppress is that court would have had to find certain fact); *State v. Martin*, 243 Neb. 368, 500 N.W.2d 512 (1993) (stating that district court must not have believed defendant's testimony).

Such findings of fact may be indispensable to a proper appellate review. See, 5 Wayne R. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 11.2(e) (3d ed. 1996); *United States v. Brown*, 716 F.2d 457 (7th Cir. 1983); *State v. Johnson*, 16 Or. App. 560, 519 P.2d 1053 (1974). Without

guidance, we might not know whether the trial court rejected a defendant's factual contentions or had acted on some legal basis. Under our standard of review, we would not know the basis of the trial court's judgment. A different standard of review applies to each. Henceforth, district courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress. The degree of specificity required will vary, of course, from case to case.

Nonetheless, our review of this matter can proceed on the record before us. Osborn's motion to suppress expressed one contention: that the locking of Osborn in a room without an arrest warrant constituted an illegal seizure. By denying Osborn's motion to suppress, the district court rejected Osborn's contention. Our review is framed by the factual findings and legal conclusions implicit in the district court's decision regarding Osborn's argument, and we find no clear error.

The trial court clearly found the testimony of the police officers that the interview room door was unlocked and that the door was generally open to be more credible than Osborn's testimony. However, the question of the locked door does not fully resolve the issue of whether Osborn was illegally seized for 3 hours. Locked or unlocked, if the circumstances surrounding the encounter were such that a reasonable person would not have felt free to leave, Osborn might have been illegally seized.

"It has been determined that one who voluntarily accompanies the police for questioning has not been seized. It has also been said, however, that one's initially consensual encounter with the police may be transformed into a seizure or detention by subsequent events." *State v. LaChappell*, 222 Neb. 112, 117, 382 N.W.2d 343, 347 (1986). See, also, *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993); *State v. Beard*, 221 Neb. 891, 381 N.W.2d 170 (1986).

Osborn testified that he voluntarily went to the police station at his father's request. During the drive to the station, Osborn could have protested or requested his father's assistance. Osborn was not seized at the time he entered the police station. We next address whether Osborn withdrew his volun-

tary agreement to be questioned by the police at the police station.

In *State v. Beard, supra,* Beard arrived at the scene of a murder while police officers were beginning their investigation of the crime. Beard was identified as the victim's boyfriend. Although the officers had no reason to suspect Beard, he was asked to come to the police station for questioning. Beard made no complaint and was driven to the police station by an officer. Beard was not handcuffed, and he rode in the front seat. Once at the police station, Beard was read his *Miranda* rights. Although Beard initially denied any involvement in the crime, he confessed after approximately 4 hours of questioning that he had killed the victim.

We affirmed in *Beard* the trial court's implicit factual finding that Beard had voluntarily accompanied police to police headquarters. The fact that Beard considered himself not free to leave after he arrived at the station was immaterial because it is not necessary that police tell a suspect that he or she has the right not to accompany police in order for the suspect to know that he or she may refuse. We further held that while it is true that an initially consensual encounter with the police may be transformed into an unreasonable seizure or detention by subsequent events, Beard never manifested any indication that he sought to revoke his initial consent.

Similarly, Osborn willingly went to the police station and never manifested any indication that he had withdrawn his consent. After Osborn arrived at the police station, he never asked to leave or talk to his father. Osborn admitted that he was generally comfortable in the room and that only the purportedly locked door made him believe that he was not free to leave. The totality of these factual circumstances supports the trial court's conclusion that Osborn's confession was not the fruit of an illegal seizure.

### OSBORN'S VOLUNTARY CONFESSION

Osborn also asserts that his confession was not freely and voluntarily made and, therefore, was not admissible. Osborn asserts that when Officer Wilson consoled Osborn, he induced the confession.

"[T]o be admissible in evidence, an accused's statement must be shown by the State to have been freely and voluntarily given and not to have been the product of any promise or inducement—direct or indirect—no matter how slight." *State v. Bronson*, 242 Neb. at 937, 496 N.W.2d at 889.

Officer Wilson promised nothing to Osborn in exchange for his confession. Wilson merely told Osborn that he would feel better if he talked and stated something to the effect that Osborn might be a "victim of circumstances."

At the suppression hearing, Osborn testified on cross-examination regarding his confession as follows:

Q. At that point in time, then, you did, in fact, cooperate with the police during this interview; is that true?

A. Yes.

Q. And you answered their questions?

A. Yes.

Q. Okay. They didn't do anything in this interview to force you to answer the questions; is that true?

A. No.

Q. And they didn't promise you anything in return for making a statement?

A. No.

Q. They didn't threaten you in any manner to get you to make a statement; is that true?

A. No.

Q. The statement that you gave the police, was that something that you gave freely and voluntarily to them?

A. Yes.

Q. And they didn't trick you into saying anything or coerce you in any way, did they?

A. No.

Q. And at least at that point you wanted to cooperate with them and tell them your version of what happened; is that true?

A. Yes.

Based on the facts and Osborn's own testimony, we find that the confession was freely and voluntarily made.

## CONCLUSION

The convictions and sentences imposed are affirmed.

AFFIRMED.