## VI. CONCLUSION

We conclude that Arlene is liable for breach of contract but not for misappropriation of trade secrets or unjust enrichment. We modify the judgment against Arlene accordingly. We also conclude that Mark is not liable for misappropriation of trade secrets or unjust enrichment. We reverse the judgment against Mark.

Affirmed in part as modified,
and in part reversed.

Stephan, Miller-Lerman, and Cassel, JJ., not participating.

———————————

State of Nebraska, appellee, v.
Antwan L. Jones, appellant.

___ N.W.2d ___

Filed November 22, 2013.    No. S-12-1208.

1. **Identification Procedures: Due Process: Appeal and Error.** A trial court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.
2. **Motions to Suppress: Trial: Pretrial Procedure: Appeal and Error.** When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.
3. **Motions to Suppress: Courts: Records.** District courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress. The degree of specificity required will vary from case to case.
4. **Constitutional Law: Identification Procedures: Due Process.** An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law.
5. **Trial: Identification Procedures: Police Officers and Sheriffs: Evidence.** In determining the admissibility of an out-of-court identification, the trial court must first decide whether the police used an unnecessarily suggestive identification procedure. If they did, the court must next consider whether that procedure so tainted the resulting identification as to render it unreliable and thus inadmissible.
6. **Criminal Law: Identification Procedures: Witnesses: Words and Phrases.** A showup is usually defined as a one-on-one confrontation where the witness views only the suspect, and it is commonly conducted at the scene of the crime, shortly after the arrest or detention of a suspect and while the incident is still fresh in the witness' mind.

7. **Identification Procedures.** Reliability is the linchpin in determining the admissibility of identification testimony.
8. ____. Factors to be considered in determining the reliability of a witness' identification include (1) the opportunity of the witness to view the alleged criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his or her prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Against these factors is to be weighed the corrupting influence of the suggestive identification itself.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

Karen A. Newirth and Barry C. Scheck for amicus curiae The Innocence Project.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Heavican, C.J.

## I. INTRODUCTION

Following a jury trial, the district court convicted Antwan L. Jones of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Jones appeals, arguing the district court erred in overruling Jones' motions to suppress eyewitness identifications. Jones also argues the district court failed to articulate its findings in overruling the motions to suppress. We affirm.

## II. BACKGROUND

Dejuan Johnson was shot and killed on the afternoon of September 24, 2011. That afternoon, Dejuan and his cousin, Herbert Johnson, were walking along Ames Avenue in Omaha, Nebraska, when Herbert observed a black male wearing a black Carhartt jacket, a baseball cap, and jeans exit from a vehicle and walk behind them. Herbert glanced back at the man three

times. The third time Herbert looked back, the man asked, "What's up now . . . ," aimed a gun at Dejuan, and fired.

Herbert was a few feet from the shooter when the shooter spoke. Herbert estimated that he observed the shooter's face for 20 to 30 seconds. Herbert noticed the shooter had gold teeth and a scar on his face. Police quickly arrived at the scene. The shooter fled on foot.

Herbert gave police a description of the shooter, stating he was a black male approximately 5 feet 11 inches to 6 feet 1 inch, 160 to 170 pounds, wearing a black "fitted hat," a black Carhartt jacket, a black undershirt, and blue or black jeans. A few minutes after giving his initial description, Herbert also told officers the shooter had gold upper teeth. Approximately 15 to 20 minutes later, officers told Herbert they believed they had found the shooter but were not sure and asked if Herbert would identify him. Officers brought Jones, in handcuffs, to the scene. Herbert told officers Jones was similar in height and weight, but was not wearing the same clothes as the shooter. Herbert asked an officer to have Jones smile, and seeing Jones' gold teeth, Herbert made a positive identification.

At the motion to suppress hearing and again at trial, Herbert identified Jones as the shooter. Herbert testified he was "a hundred percent sure" of his identification based on a scar on Jones' face and his gold teeth.

Officer Robert Myers of the Omaha Police Department was on duty on the afternoon of September 24, 2011, patrolling in the area of 55th Street and Ames Avenue, when he observed two people on the northwest corner—one lying on the ground, and another standing over him. The standing party looked at Myers for approximately 2 seconds before fleeing, and Myers observed him to be a black male wearing dark clothing, approximately 5 feet 10 inches to 6 feet tall. Myers also observed that the party held a silver automatic handgun. Myers then noticed a third party across the street who also appeared to be running from the intersection. The third party, later identified as Herbert, soon returned to the scene. Myers ordered Herbert to stay where he was and radioed for assistance, stating that he had heard shots fired, that a party was down, that a black male in black clothing was seen running northeast, and

that he was holding another party at gunpoint. When backup arrived, Myers ran to the party on the ground, later identified as Dejuan. Myers performed CPR until paramedics arrived and then rode in an ambulance with Dejuan to a hospital. Myers was called back to the scene roughly an hour later to identify a possible suspect.

Upon returning to the area, Myers parked his police cruiser approximately 1½ blocks from the scene and began to walk toward the intersection of 55th Street and Ames Avenue. While walking, he observed another cruiser with a party seated in the back seat. Myers approached, opened the door to the cruiser, and spoke to the party seated in the back seat. The party identified himself as Jones. As they spoke, Myers recognized Jones as the party with the gun who had fled from the scene earlier. Myers then located the command officer on the scene and told her that the party in the cruiser was the same party he had previously seen running from the scene. Myers testified that he was "[a] hundred percent" certain he recognized Jones as the party with the gun.

Myers identified Jones in court at the motion to suppress hearing. Myers stated he had "no doubt" Jones was the party Myers saw with a gun on the corner of 55th Street and Ames Avenue. Myers also identified Jones at trial.

A dark T-shirt and pair of jeans were found in a nearby apartment. A black cap with an "M" on it was found nearby, and a black Carhartt jacket was found in a Dumpster near the apartment building. In the sleeve of the jacket, officers found a silver handgun. Ballistics testing later revealed that this gun matched shell casings found at the scene, and testing showed Jones to be the likely source of DNA found on the jeans. Surveillance video from a nearby store showed Jones wearing the dark jeans, T-shirt, and cap approximately an hour prior to the shooting.

A jury found Jones guilty of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Jones was sentenced to life imprisonment for first degree murder, 40 to 50 years' imprisonment to be served consecutively for use of a deadly weapon to commit a felony, and 40 to 50 years' imprisonment to be

served concurrently for possession of a deadly weapon by a prohibited person.

### III. ASSIGNMENTS OF ERROR

Jones assigns the following errors of the district court, restated and reordered: (1) The court erred when it failed to articulate its findings in overruling Jones' motions to suppress the eyewitness identifications of Herbert and Myers, and (2) the court erred in overruling the motions to suppress and in subsequently allowing both witnesses to make in-court identifications of Jones.

### IV. STANDARD OF REVIEW

[1] A trial court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error.[1]

[2] When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress.[2]

### V. ANALYSIS

#### 1. ARTICULATION OF FINDINGS

In his first assignment of error, Jones argues that the court's rulings regarding Jones' motions to suppress lacked specific factual findings and that thus, this court is precluded from any meaningful review.

[3] This court has held that "'district courts shall articulate in writing or from the bench their general findings when denying or granting a motion to suppress.'"[3] We have further noted that the degree of specificity required will vary case to case.[4]

---

[1] *State v. Dixon, ante* p. 334, 837 N.W.2d 496 (2013).

[2] *State v. Bromm*, 285 Neb. 193, 826 N.W.2d 270 (2013); *State v. Ball*, 271 Neb. 140, 710 N.W.2d 592 (2006).

[3] *State v. Graham*, 259 Neb. 966, 971, 614 N.W.2d 266, 270 (2000) (quoting *State v. Osborn*, 250 Neb. 57, 547 N.W.2d 139 (1996)).

[4] *Id*.

The district court's orders in this case tell us little beyond that the court found the police procedures were not unduly suggestive and that the identifications were reliable. It would have been helpful if the court's articulation of factual findings had been more detailed; however, the facts were not in dispute in the motions to suppress. Jones offered no witnesses or other evidence at the motion to suppress hearings. As such, we can infer that the court found the State's witnesses credible and we are able to proceed to consideration of the merits of the motions to suppress based on the record before us. Accordingly, we find Jones' first assignment of error to be without merit.

## 2. Eyewitness Identifications

In his second assignment of error, Jones argues that the district court erred in overruling his motions to suppress the eyewitness identifications of Herbert and Myers, because police procedures used in obtaining these identifications were unduly suggestive, in violation of the Due Process Clauses of the U.S. and Nebraska Constitutions. Additionally, we note the concerns set forth in the amicus brief submitted by The Innocence Project. But those arguments were not urged at the time of trial, and as such, we decline to apply them on appeal.

[4,5] An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law.[5] The U.S. Supreme Court provides a two-part test for determining the admissibility of an out-of-court identification: "[T]he trial court must [first] decide whether the police used an unnecessarily suggestive identification procedure. . . . If they did, the court must next consider whether [that] procedure so tainted the resulting identification as to render it unreliable and thus inadmissible."[6]

---

[5] *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005); *State v. Faust*, 269 Neb. 749, 696 N.W.2d 420 (2005); *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004).

[6] *Perry v. New Hampshire*, ___ U.S. ___, 132 S. Ct. 716, 722, 181 L. Ed. 2d 694 (2012).

### (a) Eyewitness Identification
### by Herbert

[6] A showup is usually defined as a one-on-one confrontation where the witness views only the suspect. A showup is commonly conducted at the scene of the crime, shortly after the arrest or detention of a suspect, while the incident is still fresh in the witness' mind.[7] The State concedes Herbert's identification of Jones constituted a showup. However, admission of evidence of a showup does not, by itself, violate due process.[8]

[7,8] "Reliability is the linchpin in determining the admissibility of identification testimony."[9] We have stated:

> The factors to be considered [in determining the reliability of a witness' identification] include (1) the opportunity of the witness to view the alleged criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his or her prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. . . . Against these factors is to be weighed the corrupting influence of the suggestive identification itself.[10]

We consider these factors in turn.

### (i) Opportunity to View Shooter

The shooting occurred outdoors in broad daylight. Herbert testified that he glanced at the shooter three times over a short span of time prior to the shooting. Herbert also observed the shooter's face for 20 to 30 seconds from a distance of roughly 3 feet when the shooter spoke to Dejuan and fired his gun. Herbert had time to observe the suspect, and his observation was free from any obstructions. This factor weighs in favor of reliability.

---

[7] *State v. Garcia*, 235 Neb. 53, 453 N.W.2d 469 (1990).

[8] *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

[9] *State v. Faust, supra* note 5, 269 Neb. at 757, 696 N.W.2d at 427.

[10] *Id.* (citations omitted).

### (ii) Degree of Attention

Herbert's testimony indicated that he glanced at the shooter repeatedly prior to the shooting because he was "on the alert" while in that area of the city. Once Herbert was confronted, his attention was focused on the shooter until the police arrived. One might assume there was some degree of panic at the sight of the gun, and Herbert testified that both he and Dejuan attempted to run away when the shooter began firing. However, Herbert had viewed the shooter more than once by looking back while walking before the shooter actually spoke and pulled out the gun. This factor also weighs in favor of admissibility.

### (iii) Prior Description

Herbert provided police with a relatively detailed description of the shooter, including race, approximate age, height, weight, and clothing. Prior to being shown the suspect, Jones, Herbert also told officers that the shooter had gold upper teeth. Although Jones was wearing different clothing when located, Herbert noted such, and clothing matching the description provided by Herbert was located in the area.

Jones does not argue that the description provided by Herbert was inaccurate, but notes that Herbert failed to include Jones' facial scar in his description to police. While a description including the scar would also have weighed strongly in favor of reliability, the description of the shooter's gold teeth provided a distinguishing feature which bolstered the reliability of Herbert's identification. The description provided was sufficiently detailed and accurate to weigh in favor of reliability.

### (iv) Level of Certainty

It was undisputed that Herbert was not positive whether Jones was the shooter until he saw his gold teeth. However, even prior to inquiring whether Jones had gold teeth, Herbert told officers that Jones looked similar, and noted Jones was not wearing the dark jacket, shirt, and jeans he had been wearing during the shooting.

Herbert testified that he was "a hundred percent sure" of his identification, but one officer on the scene testified that

at the time of the identification, Herbert stated he was "fairly confident" Jones was the shooter. The officer was uncertain of the precise language used by Herbert, but testified that Herbert seemed confident. This was not a case where the eyewitness expressed notable doubt. Taking the circumstances as a whole, we find that this factor weighs in favor of reliability.

### (v) Time Before Confrontation

There is some uncertainty in the record regarding timing, but considering all of the testimony, it seems Herbert's identification of Jones took place 15 minutes to 1 hour after the shooting. The identification took place at the scene of the crime while it was still fresh in the witness' mind. This factor weighs strongly in favor of reliability.

### (vi) Conclusion

Herbert had an unobstructed view of the shooter from a close distance. He provided police with a detailed description of the shooter, and his identification of Jones took place shortly after the shooting occurred. Even assuming that the identification was procured under unnecessarily suggestive circumstances arranged by law enforcement, considering the totality of the circumstances, the identification was reliable and its admission was not a violation of due process.

### (b) Eyewitness Identification by Myers

As the State notes, although Myers was called back to the scene for the purpose of identifying a suspect, his identification was essentially unprompted. "When no improper law enforcement activity is involved . . . it suffices to test reliability through the rights and opportunities generally designed for that purpose . . . ."[11]

While Myers was not actually asked to identify Jones, there may have been some degree of suggestiveness created by Jones' being handcuffed and in the back of a police cruiser at the scene of the crime. As such, we consider the reliability factors in turn.

----

[11] *Perry v. New Hampshire*, *supra* note 6, 132 S. Ct. at 721.

### (i) Opportunity to View Suspect

Although the observation took place in daylight, free from obstruction, Myers had only a moment to view the suspect's face. This first factor likely weighs against reliability.

### (ii) Degree of Attention

Myers was not a casual observer, but a trained police officer on duty who knew that his recollection of the suspect's face would likely be critical to the suspect's arrest.[12] This factor weighs in favor of reliability.

### (iii) Prior Description

The description provided by Myers over his radio was general, but there is no indication that anything Myers stated was inaccurate. Furthermore, the record does not indicate Myers had the opportunity to provide a detailed description to anyone before he observed Jones in the police cruiser and identified him as the party with the gun. This factor weighs in favor of reliability.

### (iv) Level of Certainty

Myers expressed that he had "no doubt" Jones was the party he saw with the gun. His certainty weighs in favor of reliability.

### (v) Time Before Confrontation

Although the record is not entirely clear as to the timing, the testimony as a whole indicates Myers' identification of Jones took place somewhere between ½ to 1½ hours after he observed the suspect run from the scene of the shooting. This factor weighs heavily in favor of reliability.

### (vi) Conclusion

Myers had an unobstructed view of the suspect. He was a trained police officer on duty when he viewed the suspect. Upon returning to the scene, Myers recognized Jones after speaking with him, without prompting from other officers. Considering the totality of the circumstances, Myers'

---

[12] See *Manson v. Brathwaite*, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

identification was reliable and its admission was not a violation of due process.

### (c) Conclusion Regarding
### Eyewitness Identifications

In considering the reliability factors set forth above, the eyewitness identifications of both Herbert and Myers were reliable. Moreover, the descriptions separately provided by Herbert and Myers were not inconsistent with each other, nor were they inconsistent with the other evidence produced at trial. As such, both identifications were admissible. Jones' second assignment of error is without merit.

### VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED.

———————————

STATE OF NEBRASKA EX REL. COUNSEL FOR DISCIPLINE
OF THE NEBRASKA SUPREME COURT, RELATOR, V.
DONNA J. TONDERUM, RESPONDENT.

___ N.W.2d ___

Filed November 22, 2013.    No. S-13-083.

1. **Disciplinary Proceedings.** A proceeding to discipline an attorney is a trial de novo on the record.
2. ____. Under Neb. Ct. R. § 3-304, the Nebraska Supreme Court may impose one or more of the following disciplines: (1) disbarment; (2) suspension; (3) probation in lieu of or subsequent to suspension, on such terms as the court may designate; or (4) censure and reprimand.
3. ____. To determine whether and to what extent discipline should be imposed in an attorney discipline proceeding, the Nebraska Supreme Court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the offender generally, and (6) the offender's present or future fitness to continue in the practice of law.
4. ____. Each attorney discipline case must be evaluated individually in light of its particular facts and circumstances, and the Nebraska Supreme Court considers the attorney's acts underlying the events of the case and throughout the proceedings.