STATE OF NEBRASKA, APPELLEE, V. SCOTT L. SMITH, APPELLANT.

494 N.W.2d 558

Filed January 29, 1993.   No. S-91-745.

Thomas J. Garvey, Sarpy County Public Defender, and Robert C. Wester for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

After a jury trial in the district court for Sarpy County, defendant, Scott L. Smith, was convicted of the first degree murder of his mother, Linda Smith; the first degree murder of his sister, Amy Smith; and the attempted first degree murder of his father, Lynn Smith. Additionally, defendant was convicted of the use of a firearm in the commission of each of the felonies.

After a sentencing hearing, defendant was sentenced to a life term for each of the murders and to 20 years in prison for the attempted murder, with the provision that each of these terms would be served concurrently. Defendant was also sentenced to a term of 5 years in prison for the use of a firearm in each felony, with the provision that these sentences would be served consecutively to each of the felony sentences.

Defendant timely appealed to this court, where he assigns a single error: "The [district] Court erred as a matter of law in failing to suppress and exclude from evidence the confession given by Appellant to law enforcement personnel." We affirm.

The record shows that on November 10, 1990, Linda Smith and her daughter, Amy Smith, were found dead in their home in Sarpy County. Both had been shot numerous times with a .22-caliber handgun. Lynn Smith, the husband of Linda Smith and father of Amy Smith and defendant, discovered the body of Linda Smith when he came home from work. Upon this discovery, Lynn Smith was confronted by his son, the defendant, who was holding a handgun. Lynn Smith ran out of the house and eventually eluded defendant, who chased him with the gun. Lynn Smith then called the police from a residence in the neighborhood. Defendant was 19 years old at this time.

Shortly thereafter, defendant was found near the home and arrested by Trooper Michael Malmstrom of the Nebraska State Patrol. The trooper told defendant that he was under arrest for suspicion of homicide, placed defendant in a police vehicle, and advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Trooper Malmstrom testified that he used a card which sets out 10 items to be read when informing a suspect of his *Miranda* rights. Defendant nodded his head in acknowledgement of each right from one to seven and never indicated that he did not understand what was being said to him. Trooper Malmstrom then read point number eight: "Do you willingly do without the services of a lawyer at this time?" In response, defendant stated that he wished to have a lawyer present. Questioning by the trooper stopped at this point.

Approximately 7 or 8 minutes after the arrest, defendant was

placed in the unmarked police car of Sarpy County Deputy Sheriff Kris Yount, who had known defendant for more than a year. Their relationship had begun when Deputy Yount was investigating an unrelated crime in which defendant was the victim and a witness. Deputy Yount took defendant to the Sarpy County Jail. En route, Deputy Yount asked defendant if he had graduated from high school. Defendant responded by asking: " 'If I told them I don't want to talk, does that mean I can't talk to you, too?' " Deputy Yount informed defendant that since he did not want to make a statement about what happened at his house, she would not ask him about it. Deputy Yount later testified that she was just making conversation at this time. Defendant then said that he had graduated from high school.

A few minutes later, defendant asked if there was a death penalty in Nebraska. Upon Deputy Yount's reply that there was, defendant said, " 'Oh, no,' " and started to cry. Shortly thereafter, they arrived at the Sarpy County Jail, where Deputy Yount told defendant that she would be around the jail for a while. Defendant was then taken to the booking area and booked by another officer while Deputy Yount went to another part of the jail. Defendant was placed in a holding cell after his booking was completed.

Approximately 10 or 15 minutes after Deputy Yount had turned defendant over to the other officer, she was informed that defendant wanted to talk to her. Deputy Yount then got a tape recorder and a *Miranda* rights advisory form and went to the interview room to which defendant had been transferred. When she entered the room, Deputy Yount asked defendant what he wanted to talk to her about. Defendant replied that he wanted to make a statement, at which time Deputy Yount read the *Miranda* rights advisory form to defendant. The form advised that Deputy Yount was a police officer; that defendant had a right to remain silent and not make any statements or answer any questions, but that anything he said could and would be used in court; that he had a right to consult with a lawyer and have the lawyer present during questioning; that if he could not afford a lawyer, one would be appointed for him by the court; that knowing these rights, he was willing to make a statement; and that he willingly waived the services of

an attorney at that time. Each right ended with the question: "Do you understand that?" Defendant wrote "yes" next to each question and initialed each response. Deputy Yount then tape-recorded defendant's statement, which was later transcribed. Defendant later filed a motion to suppress the statement, which was overruled after a pretrial hearing on the matter. At trial, the statement was received in evidence over objection by counsel for the defendant.

In view of the narrow scope of the inquiry presented by the assignment of error, a detailed recitation of the facts surrounding the murders and attempted murder giving rise to this appeal is not necessary. Suffice it to say that the record shows overwhelming evidence to support defendant's convictions.

The single assignment of error made by defendant can be separated into two issues for the purpose of discussion. First, defendant asserts that his statement should have been suppressed because the police allegedly initiated dialogue with defendant after he had invoked his Fifth Amendment right not to proceed without the services of an attorney. Second, defendant contends that the State failed to overcome its burden of proving that a valid waiver of the right to remain silent and right to counsel was made knowingly and intelligently.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court held that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. See *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992). The Court characterized "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. at 444. See, also, *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991).

The U.S. Supreme Court has further held: "To protect the privilege against self-incrimination guaranteed by the Fifth Amendment . . . the police must terminate interrogation of an

accused in custody if the accused requests the assistance of counsel." *Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S. Ct. 486, 112 L. Ed. 2d 489 (1990) (citing *Miranda v. Arizona, supra*).

In the case at bar, defendant was advised of his *Miranda* rights upon his arrest by Trooper Malmstrom, at which time he stated that he wished to have a lawyer. Accordingly, questioning ceased at that time. Defendant was then taken to the Sarpy County Jail by Deputy Yount and transferred to the custody of another officer for booking. While transferring him, Deputy Yount told defendant that she "would be there for a little while" "[i]f he wanted to talk." About 10 to 15 minutes later, defendant told the booking officer: "I want to talk to her." Deputy Yount got a tape recorder and, after again giving defendant his *Miranda* rights by reading them to him and having him initial and sign a *Miranda* rights advisory form, took defendant's statement in which he confessed to the crimes in question.

According to Deputy Yount, when defendant signed the form, he appeared to understand the questions, and he responded clearly. Deputy Yount stated that no threats, force, promises, or coercion of any kind were used to obtain the confession.

It is upon this set of facts that defendant bases his argument that his confession should have been suppressed. In *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the U.S. Supreme Court set out the following rule governing subsequent waivers of an accused's invoked right to counsel:

> [A]lthough we have held that after initially being advised of his *Miranda* rights, the accused may himself validly waive his rights and respond to interrogation, see *North Carolina v. Butler*, [441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)], the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused,

such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*

(Emphasis supplied.) *Edwards v. Arizona*, 451 U.S. at 484-85.

Further, in *Minnick v. Mississippi, supra,* the U.S. Supreme Court stated that its holdings in *Miranda v. Arizona, supra,* and *Edwards v. Arizona, supra,* did "not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities." *Minnick v. Mississippi,* 111 S. Ct. at 492.

Our inquiry is limited to determining whether defendant initiated the conversation during which he confessed or whether Deputy Yount initiated the interaction between defendant and herself in violation of *Miranda v. Arizona, supra,* and its progeny. The facts set out above are not disputed, but their legal significance is. Defendant contends that Deputy Yount initiated the dialog with him when she told him, while turning him over for booking, that she " 'would be around for a little while.' " Brief for appellant at 7. In fact, defendant charges that Deputy Yount "was coyly and shrewdly conning [defendant] into entering [into] a discussion about the crimes." *Id.* The State, on the other hand, takes the position that the defendant initiated the dialog when he asked to speak to Deputy Yount.

The U.S. Supreme Court has stated that *Edwards v. Arizona, supra,* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990). The Court has also held that "[t]his was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." *Oregon v. Bradshaw,* 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983).

In *State v. Joy,* 218 Neb. 310, 353 N.W.2d 23 (1984), the accused told her custodial officers that her attorney had advised her not to say anything unless she was present. The officers, on

their own initiative, contacted the attorney, who told them that she was not representing the accused. The accused was informed of this and, even though she refused to sign the standard *Miranda* rights advisory form, was subjected to further interrogation. In ruling that the accused's statement had to be suppressed, we stated:

> Once the right to counsel and the right to remain silent have been invoked by a defendant, the defendant cannot be persuaded to waive his rights, and there is a strong presumption against waiver. If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.

*Id*. at 312-13, 353 N.W.2d at 25.

Unlike in *State v. Joy, supra*, however, there can be no doubt in this case that when defendant asked to speak to Deputy Yount, he " 'initiated' further conversation in the ordinary dictionary sense of that word." *Oregon v. Bradshaw*, 462 U.S. at 1045. Defendant's request "evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship." *Oregon v. Bradshaw*, 462 U.S. at 1045-46. The fact that Deputy Yount had told defendant that she would be around for a little while prior to defendant's request does not negate the fact that defendant initiated the dialog. Deputy Yount's statement was not intended to start a conversation, but merely informed defendant that she would be available if he wished to initiate a dialog. The State met its burden of proving that defendant waived his privilege against self-incrimination and his right to counsel.

Since there was no violation in this case of the rule in *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), the next inquiry is:

> [W]hether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including

the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

*Edwards v. Arizona*, 451 U.S. at 486 n.9.

This determination depends upon " 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *North Carolina v. Butler*, 441 U.S. 369, 374-75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938)). See, also, *Edwards v. Arizona, supra*.

Among the circumstances to be considered in this case, two are of particular import to our deliberations: First, the evidence shows that defendant is at least somewhat mentally deficient; second, he had been the victim of a sexual assault some time before the incidents in the case at bar. The assault had been the subject of a trial in 1989. Although both defendant and the State concede that these factors are present, there is disagreement as to their effect on defendant's waiver of his *Miranda* rights.

The defendant's primary witness on this subject, Cynthia Topf, Ph.D., testified that one IQ test measured defendant's full-scale IQ at 65. This would place defendant below the mean of average intelligence, in the diagnostic category of mild mental retardation. Dr. Topf also testified, however, that another test measured defendant's IQ at 73, placing him in the borderline range of intelligence, slightly above the 70-point cutoff for mental retardation. Dr. Topf said that defendant would not be able to understand words and phrases that he read as well as the average person, and she stated:

> [T]here may be some words that Scott would not be able to read or understand. I think the larger problem would be the total understanding of what the sentences mean, the ability . . . to read the sentence might have been there, but to comprehend it I don't believe would have been there.

In addition, Dr. Topf had diagnosed defendant as suffering from posttraumatic stress disorder some 3 months before the incident at trial. Posttraumatic stress disorder was described by Dr. Topf as being characterized by delusions or hallucinations—a break with reality. She said she believed that

defendant was subject to such occurrences when he was under stress, and said that, in her opinion, he was experiencing a brief reactive psychosis on November 10, 1990, the day of the murders. Accordingly, she said that defendant would not have been able to understand the *Miranda* rights advisory form and its significance. Dr. Topf said she believed that the disorder was a result of the sexual assault of defendant by a family friend, which sexual assault was the subject of a trial some 6 months before the incident at issue.

Dr. Louis Martin, a physician specializing in psychiatry, testified on behalf of the State. Dr. Martin had had contact with defendant for approximately 8 to 10 weeks while he was being evaluated in the Lincoln Regional Center after the murders. Based upon these contacts and the findings of his staff, Dr. Martin testified that defendant understood and comprehended the information contained in the *Miranda* rights advisory form, as read to him by Deputy Yount. The fact that defendant asked for an attorney after being read his rights by Trooper Malmstrom supported Dr. Martin's opinion that defendant understood his rights, because when a person is given options and chooses one, such a person probably understands what he is talking about, "particularly if as in this instance the choice appeared . . . to be consistent with . . . a protection of his rights."

Dr. Martin also testified that he saw no clinical indication that the defendant was not aware of what was going on when he was at the police station or before arriving there. Accordingly, he testified that he did not agree with Dr. Topf's conclusion that defendant had suffered a psychotic break on November 10, 1990. Dr. Martin based this determination on the completeness of defendant's confession, stating that "it would be very unusual for a person who had been psychotic, later and within a relatively brief period of time, to be able to give you an account of events as they occurred at that time, which was a rational consistent account."

In determining the correctness of a trial court's ruling on a motion to suppress, an appellate court will uphold the trial court's findings of fact unless those findings of fact are clearly erroneous. *State v. Garza*, 241 Neb. 934, 492 N.W.2d 32 (1992);

*State v. Gibbs*, 238 Neb. 268, 470 N.W.2d 558 (1991). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that the trial court has observed witnesses testifying in regard to such motion. *State v. Tingle*, 239 Neb. 558, 477 N.W.2d 544 (1991); *State v. Walker*, 236 Neb. 155, 459 N.W.2d 527 (1990).

In the instant case, in overruling defendant's motion to suppress, the district court found that defendant validly waived his right to counsel, knowingly and intelligently, and that his statement was properly admissible. The evidence fully supports these findings. The judgment of the district court is affirmed.

AFFIRMED.