STATE OF NEBRASKA, APPELLEE, V.
DANNY L. BALL, APPELLANT.
710 N.W.2d 592

Filed March 3, 2006. No. S-05-175.

Robert P. Lindemeier, of Ruff, Lindemeier, Gillett & Wadewitz, and Gary J. Krajewski, of Krajewski Law Office, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

A jury convicted Danny L. Ball of first degree murder and use of a weapon to commit a felony. Law enforcement officers searched his truck and mobile home; detained him for questioning; and despite his asking for a court-appointed lawyer, interrogated him twice without counsel. Ball ultimately confessed to the crime. Ball moved to suppress his statements and the evidence obtained from searching his truck and mobile home. The trial court admitted everything but his first statement at trial. Ball argues several interrelated issues: (1) Police illegally searched and seized his truck, (2) police arrested him without probable cause, (3) police obtained his confession illegally, and (4) search warrant affidavits for his truck and mobile home relied on illegally obtained evidence.

## I. BACKGROUND

About 1:30 a.m. on October 7, 2003, while in his mobile home, Randy Tomjack was stabbed 59 times. Dying, he called the 911 emergency dispatch service without giving his name or a specific address. A dispatcher sent an ambulance to the subdivision where Tomjack's home was located. The emergency responders, however, had difficulty finding the caller and asked several local residents for help.

Meanwhile, the dispatcher sent Darrick Arndt, a deputy with the Keith County sheriff's office, to the scene. From the dispatcher's information, Arndt thought Tomjack might be the caller. Arndt met the emergency response team and some subdivision residents and guided them to Tomjack's home. Shortly thereafter, Ball arrived in his truck. Before following the emergency team, a resident told Ball that they were on their way to Tomjack's home.

On arriving at the home, Arndt and Earl Schenck, the Keith County sheriff, found Tomjack dead, slumped on the couch and covered in blood. Shortly after the emergency team arrived, Ball joined the crowd at Tomjack's home. While approaching the home, he asked an emergency medical technician if Tomjack was all right. Ball next asked Arndt and Schenck what had happened and asked if he could see Tomjack because he wanted to get cigarettes from him. Schenck told him to leave the scene and if he did not leave, he would be charged with obstructing justice.

When it became apparent Tomjack was dead, Ball became distraught. Because Ball was visibly drunk, Renee Lucero, a resident of the subdivision, offered to drive Ball home in his truck. Lucero testified that Ball was crying and upset, saying he had lost his friend. On the way to his home, Ball suddenly reached over and turned off the truck's ignition. Frustrated, Lucero then pulled over, and she began walking toward the nearby restaurant where Ball worked. Ball passed out in the ditch near the truck, and later his employer picked him up and drove him to the restaurant.

After leaving Tomjack's home, Arndt and Schenck went to the restaurant to speak with Ball. Arndt noticed that Ball had recently showered and had no physical injuries. Ball explained that he showered after he got off work around 10:30 p.m. Also, Schenck testified that while sitting with Ball, Ball said: "[Tomjack] made me so mad because he was lying about all the hours he was getting in this new job, and he bragged about it, and he made me so mad about that. . . . But I didn't want him to die." Schenck also heard Ball sobbing loudly at the restaurant.

Arndt then checked out Ball's truck and mobile home. Arndt said that it was dark and he could not see anything in the truck, but that there was a red liquid substance on the door handle of Ball's home. But testimony about the red liquid on the door handle differed. Arndt testified that he did not think the substance on the mobile home was blood; Gary Eng, a Nebraska State Patrol investigator, stated he could not locate the substance; and Schenck said he never looked at it. But Ball's employer testified without objection that the officers told him that night that they saw blood on the door of Ball's home, and then told him, "Well, we think we have got our suspect."

Between 6 and 6:20 a.m., Tim Arnold, a Nebraska State Patrol investigator, examined the truck for evidence. Arnold stated he saw nothing suspicious from the outside of the truck. After entering the truck, he conducted a warrantless "cursory inspection" to determine whether there were valuables present needing protection. He admitted, however, that he did not follow the State Patrol's inventory policy and that one reason for examining the truck was to look for evidence. He further admitted that once he arrived on the scene, he would not have released the truck to Ball.

While examining the truck, Arnold found what appeared to be blood on the steering wheel cover, on the gearshift knob, near and in the ignition device, and on the driver's-side lap seatbelt. Despite Arnold's testimony on direct examination that he saw nothing suspicious from outside the truck, on redirect, he said that the blood was visible from outside the truck. Arnold then had the truck towed to the State Patrol office in Ogallala, Nebraska, and applied for a search warrant.

Meanwhile, around 6:50 a.m. on October 7, 2003, when Ball tried to leave the restaurant, Arndt detained him by handcuffing him and driving him to the Keith County sheriff's station to await the arrival of Bill Redinger, a Nebraska State Patrol investigator. Despite admitting Ball was in custody, the officers claimed he was not under arrest because they lacked probable cause to arrest him.

Ball and Arndt arrived at the jail at 7:27 a.m. While waiting for Redinger, Ball became impatient and wanted to leave. Despite his demands to leave the station, Ball was "detained" in a small locked room called the "attorneys' room," and all officers who testified agreed he was not "free to leave." Angry about his detention, Ball punched holes in the ceiling tiles of the attorneys' room and had to be moved to a holding cell.

At 7:47 a.m., while waiting for Redinger, Ball told Arndt he wanted a court-appointed attorney. Arndt informed his superior, who called Redinger to pass along that information. Arndt's superior told him that Redinger would interview Ball. Arndt then told Ball that he would have the opportunity for counsel when Redinger arrived. No one informed Ball of his *Miranda* rights, nor did anyone question him while waiting for Redinger.

Redinger testified that he did not recall being told that Ball wanted a court-appointed attorney.

Redinger arrived between 8:10 and 9:15 a.m. Redinger advised Ball of his *Miranda* rights and determined that he was not impaired by alcohol or drugs. After Ball waived his rights, Redinger questioned him about the murder. Redinger tried to get him to admit he was in Tomjack's home that night and that he had stabbed him, but Ball accused Redinger of "making up stories." When Ball invoked his right to counsel, Redinger had him placed in a holding cell and told him he was being held because the officers suspected he had murdered Tomjack.

After 35 to 40 minutes, Ball told the jailer he wanted to speak with Redinger again. Redinger confirmed that Ball asked to speak to him, advised him again of his *Miranda* rights, and then interviewed him again. During the second interview, Ball dictated a confession, Redinger wrote it down, and Ball signed it. Both interviews were videotaped and the videotapes were admitted into evidence. The signed confession was also admitted into evidence.

During the second interview, Ball admitted that he went to Tomjack's mobile home that night wearing a mask, slipped in the back door, and stabbed Tomjack. He said that he left when Tomjack uttered his name. He stated that he then burned his clothes, his shoes, the mask, and the knife in his fireplace. After showering, he went back to Tomjack's to see what kind of damage he had caused. It was then that he ran into the emergency team. Ball was formally booked around 3 p.m. that day, October 7, 2003.

### 1. ISSUANCE OF SEARCH WARRANTS

Eng, the lead investigator, applied for the warrants. He stated that after Redinger's second interview, he believed enough evidence existed to justify arresting Ball. He opined, however, that before the second interview, there was not probable cause to arrest. Using Ball's interview statements, he drafted search warrant affidavits for Ball's truck and home. Arnold executed the search warrant for the truck at 4 p.m. that afternoon. He photographed the red stains and swabbed them; the stains later tested positive for blood.

Eng executed the search warrant for Ball's home around 2:30 p.m. He found the blade of a large knife in the ashes of the stove. He also seized some pipes from the shower drain of Ball's home. The State Patrol crime laboratory analyzed the items seized, finding blood on the knife and the pipes. But because the samples were small, the laboratory could only match Tomjack's DNA to the blood on Ball's steering wheel cover and the door of Tomjack's home.

## 2. Suppression Hearing

Before trial, Ball moved to suppress his two statements and the evidence collected from his truck and home. He alleged that the officers violated his Fourth, Fifth, and Sixth Amendment rights. When ruling on the motion to suppress, the trial court found that Ball was in custody "from and after 6:50 a.m. when he was handcuffed and taken by . . . Arndt to the Keith County Sheriff's Office for questioning." The court also found that "as a matter of law," the officers had probable cause to take Ball into custody from and after 6 a.m. — about the time that Arnold found the blood in Ball's truck. The trial court detailed the following facts in its order:

A. Randy Tomjack had been stabbed and killed in a rural area on the north side of Lake McConaughy in Keith County, Nebraska, just before 1:34 a.m. on October 7, 2003.

B. Albee's Subdivision where the 911 call came from, is a resort area comprised of cabins and mobile homes which are generally unoccupied after the summer vacation season.

C. While investigating the homicide, Sheriff Earl Schenck and Investigator [Darrick] Arndt observed [Danny L. Ball] between 2:30 a.m. and 3:00 a.m. come to [Tomjack's] mobile home asking about the condition of . . . Tomjack and wanting to borrow cigarettes. [Ball] was unusually persistent and inquisitory about Tomjack, and had to be threatened with arrest by the Keith County Sheriff when the Defendant would not leave the premises.

D. [Ball] had recently showered. Although [Ball] states that there is a neutral explanation for this fact, it is a suspicious and unusual behavior during the hours immediately preceding or following midnight.

E. Sheriff Schenck had been advised by Ball that Ball had not seen Tomjack for two days prior to October 7, 2003, but Ball later advised the sheriff that Tomjack had been to [Ball's] residence at approximately 11:00 p.m. on October 6, 2003. [Ball] had not answered the door. Sheriff Schenck further overheard Ball crying in the bathroom of [the restaurant where he worked] stating "I didn't want him to die, Tomjack always lies, but I didn't want him to die."

F. At 6:00 a.m. on October 7, 2003, [Ball's] vehicle was inspected on the grass shoulder of Highway 92 and suspected drops of blood were observed on the steering wheel cover, gear shift knob and seatbelt. [Tomjack] had been repeatedly stabbed. Copious amounts of blood [were] observed surrounding his body. It was reasonable to assume that the assailant would have had blood on him or his clothing following the incident.

The court found that even if it was "incorrect on the issue of probable cause to arrest," Ball's second confession was an act of free will sufficient to purge the taint of unlawful detention under the Fourth Amendment. Similarly, the court found that under Fifth and Sixth Amendment precedent, Ball waived his right to counsel by initiating the conversation with Redinger. Thus, the court suppressed Ball's first statement, but admitted the second.

Regarding the warrantless search of the truck, the court found that the evidence of bloodstains was admissible under the plain view doctrine *and* that the evidence inside the truck would inevitably have been discovered later that day by the State Patrol when they inventoried the truck. Because the trial court excluded only the first statement, it concluded that the search warrants contained sufficient probable cause.

### 3. RULINGS ON RENEWED MOTION TO SUPPRESS

At trial, the court overruled Ball's continuing objections to admitting the confession, the sight of blood in his truck, and the evidence obtained using that evidence. When overruling Ball's renewed motion to suppress, the court stated that the evidence at trial was stronger than the evidence at the suppression hearing because of the testimony of Ball's employer. The court accepted the employer's recollection that the officers who secured

Ball's home believed the red substance on the door was blood, and the court concluded that this strengthened probable cause to arrest Ball.

The jury convicted Ball of first degree murder and use of a weapon to commit a felony. The court sentenced him consecutively to life imprisonment without the possibility of parole for the murder and 5 to 10 years' imprisonment for the weapon charge. Before sentencing, Ball moved for a new trial, primarily renewing his suppression argument. The court reiterated that it believed the evidence adduced at trial was more compelling than that from the suppression hearing and overruled the motion for new trial.

## II. ASSIGNMENTS OF ERROR

Ball assigns, consolidated and rephrased, that the trial court erred by overruling his motion to suppress and by admitting at trial his confession and evidence obtained from searching his truck and home. He specifically contends that (1) Arnold lacked probable cause to search and seize Ball's truck; (2) Arndt arrested Ball without probable cause; (3) Redinger ignored Ball's request for counsel; and (4) the search warrants relied on evidence obtained by violating the Fourth, Fifth, and Sixth Amendments, along with their Nebraska counterparts.

## III. STANDARD OF REVIEW

In considering a trial court's ruling on a motion to suppress evidence obtained by a search, we first determine whether the search was illegal. If so, we must determine whether the evidence that the defendant seeks to suppress is sufficiently attenuated from the illegal search. See *State v. Manning*, 263 Neb. 61, 638 N.W.2d 231 (2002).

We will uphold the trial court's ruling on a motion to suppress unless the trial court's findings of fact are clearly erroneous. In making this determination, we do not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognize the trial court as the finder of fact and consider the trial court observed the witnesses testifying in regard to such motions. See *State v. Illig*, 237 Neb. 598, 467 N.W.2d 375 (1991).

In reviewing a trial court's ruling on a motion to suppress, we review the ultimate determination of probable cause de novo

and review the findings of fact made by the trial court for clear error, giving due weight to the inferences drawn from those facts by the trial court. See *State v. Davidson*, 260 Neb. 417, 618 N.W.2d 418 (2000).

■ In determining whether the State has shown the admissibility of custodial statements by the requisite degree of proof, we will accept the factual determination and credibility choices made by the trial judge unless they are clearly erroneous and, in so doing, we will look to the totality of the circumstances. See *State v. Joy*, 218 Neb. 310, 353 N.W.2d 23 (1984).

■ A trial court's ruling on a motion to suppress, based on a claim of insufficiency of the affidavit supporting issuance of a search warrant, will be upheld unless its findings are clearly erroneous. In making this determination, we do not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognize the trial court as the finder of fact and consider it observed the witnesses. See *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004).

## IV. ANALYSIS

Relying on violations of the Fourth, Fifth, and Sixth Amendments to the U.S. Constitution, Ball seeks to suppress evidence from three distinct sources: (1) Arnold's cursory inspection of Ball's truck, (2) Ball's statements to Redinger, and (3) the evidence seized from Ball's truck and home under the search warrants. Ball's multilayered arguments are cumulative and interrelated because each piece of evidence was later used to obtain more evidence.

Specifically, officers used the sight of blood in Ball's truck to support probable cause for his arrest. While under arrest at the station, he confessed to murdering Tomjack, and both the confession and the sight of blood in Ball's truck contributed to the probable cause justifying the search warrants for his truck and home. Consequently, if the blood and confession evidence evaporates, then the affidavits lack probable cause.

### 1. BLOOD IN TRUCK

Ball contends that Arnold's testimony that he saw bloodstains inside Ball's truck should have been suppressed because Arnold

illegally searched and seized the truck the morning of the murder. Arnold testified that his supervising officers sent him to Ball's truck around 6 a.m. to look for evidence and to secure the truck. After walking around the truck, he found nothing unusual. He then opened the truck's door and conducted a "cursory inspection" of the truck's interior. He claimed to be inventorying the truck for valuables, but admitted he did not follow State Patrol protocol for inventory searches until later in the investigation.

Five to ten minutes after arriving, Arnold noticed what appeared to be blood. He then told his fellow officers what he found and stayed with the truck until 8:30 a.m., when it was towed to an impound lot. Arnold admitted that once he arrived on the scene, he would not have released the truck to Ball.

The trial court justified admitting this evidence under three alternate rationales: (1) plain view, (2) inventory, and (3) inevitable discovery. In its suppression order, the court found that the observation of the bloodstains in Ball's truck was admissible under both the plain view and the inevitable discovery doctrines. Moreover, when ruling on Ball's renewed suppression motion and on his new trial motion, the court found that it would also be admissible as an inventory search. Because we find the evidence admissible under the inevitable discovery doctrine, we need not address the other findings.

Both the U.S. and Nebraska Constitutions guarantee an individual the right to be free from unreasonable searches and seizures. See, U.S. Const. amend. IV; Neb. Const. art. I, § 7. But if the State shows by a preponderance of the evidence that the police would have obtained the disputed evidence by proper police investigation entirely independent of the illegal investigative conduct, then such evidence is admissible under the "inevitable discovery" doctrine. See *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989).

Ball argues that the State failed to meet its burden of establishing that the evidence would inevitably have been discovered by lawful means. In its suppression order, the trial court held that the evidence in the truck would have been discovered later that day when the State Patrol inventoried the truck. Ball, however, disputes this, arguing that there was no independent investigation into the truck and no legal source for a later inventory.

To overcome its burden, the State must demonstrate that some lawful means of discovery would have produced the evidence in question; that is, such evidence inevitably would have been discovered without the police misconduct. *Id.* Moreover, courts have recognized that evidence which would have been discovered in the course of a lawful inventory search can be admissible under the inevitable discovery doctrine. See, e.g., *U.S. v. Alvarez-Gonzalez*, 319 F.3d 1070 (8th Cir. 2003); *State v. McGuire*, 218 Neb. 511, 357 N.W.2d 192 (1984). See, also, Annot., 81 A.L.R. Fed. 331 (1987 & Supp. 2005) (collecting cases).

Here, the record shows that the State Patrol knew Ball left his truck sitting by the side of the road. It also shows that the State Patrol has an inventory policy for abandoned vehicles which would have allowed Arnold to impound Ball's truck and inventory its contents if Ball did not move it within 24 hours. Ball was arrested around 6:50 a.m.; he could not move his truck while in custody. Later that day, Arnold inventoried the truck according to the State Patrol's policy. Although Arnold impounded the truck prematurely after identifying the bloodstains, if he had not noticed the blood, the truck would have remained by the side of the road until the 24 hours had passed. At that point, Arnold would have lawfully entered the truck, inventoried it, and discovered the bloodstains just as he did earlier that day. Thus, even if the truck was illegally searched and seized, sufficient evidence exists that the blood would have been identified during a proper inventory search 24 hours later.

## 2. CONFESSIONS

Ball seeks to suppress the evidence obtained during his interviews with Redinger, claiming that Redinger violated his Fourth, Fifth, and Sixth Amendment rights and that thus, the fruits of those violations are inadmissible.

### (a) Fourth Amendment

Ball argues that Arndt arrested him without probable cause and that *Kaupp v. Texas*, 538 U.S. 626, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003), mandates suppressing the fruits of his illegal arrest. In *Kaupp*, the U.S. Supreme Court vacated the defendant's murder conviction, holding that when a state seeks to use a confession obtained following an illegal arrest, it must demonstrate that

the confession was an act of free will sufficient to purge the taint of the unlawful arrest.

■ The Court relied on "the Fourth Amendment rule that a confession 'obtained by exploitation of an illegal arrest' may not be used against a criminal defendant." *Kaupp v. Texas*, 538 U.S. at 627. The Court found that the officers arrested the defendant without probable cause and that thus, "well-established precedent" required suppressing the confession unless the confession was " 'an act of free will [sufficient] to purge the primary taint of the unlawful invasion.' " 538 U.S. at 632 (quoting *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

Thus under *Kaupp v. Texas, supra,* suppression is necessary only when (1) the defendant was illegally arrested *and* (2) the State fails to demonstrate that the taint of unlawful arrest has dissipated. Ball argues that, like the defendant in *Kaupp*, he was arrested without probable cause. The trial court agreed that he was in custody from 6:50 a.m. when Arndt handcuffed him and transported him to the station, but found as a matter of law that Arndt had probable cause to do so. The State also concedes that Ball was in custody at this time. Thus, the crucial question is whether the officers had probable cause to arrest Ball.

■ Whether Ball's arrest was valid depends on whether the officers had probable cause to arrest him at the moment they did so. See *Beck v. State of Ohio*, 379 U.S. 89, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964). See, also, Neb. Rev. Stat. § 29-404.02 (Reissue 1995). Probable cause escapes precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances. *Maryland v. Pringle*, 540 U.S. 366, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003); *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006). Also, probable cause merely requires that the facts available to the officer would cause a reasonably cautious person to believe that the suspect has committed an offense; it does not demand any showing that this belief be correct or more likely true than false. See *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003). See, also, *Brinegar v. United States*, 338 U.S. 160, 69 S. Ct. 1302, 93 L. Ed. 2d 1879 (1949). Moreover, probable cause is evaluated by the collective information of the police engaged in

a common investigation. *Nauenburg v. Lewis*, 265 Neb. 89, 655 N.W.2d 19 (2003). See, also, *State v. Soukharith*, 253 Neb. 310, 570 N.W.2d 344 (1997).

Ball first argues that none of the officers involved believed they had probable cause to arrest him until after he confessed. But the validity of an arrest hinges on the existence of probable cause, not the officer's knowledge that probable cause exists. See, *State v. Vermuele*, 234 Neb. 973, 453 N.W.2d 441 (1990); *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990). As the Seventh Circuit explained:

> Police officers are not required to be legal scholars. This means, among other things, that the arresting officer's knowledge of facts sufficient to support probable cause is more important to the evaluation of the propriety of an arrest than the officer's understanding of the legal basis for the arrest.

*Williams v. Jaglowski*, 269 F.3d 778, 783 (7th Cir. 2001). Thus, we focus on the facts known to the officers, not the conclusions the officers drew from those facts.

Ball also argues that the record fails to support the trial court's conclusion that probable cause existed. We disagree. The trial court enumerated multiple factors supporting its conclusion: (1) Ball arrived at Tomjack's home late at night; (2) Ball had recently showered; (3) Ball persistently asked to see Tomjack; (4) Schenck heard Ball crying and saying that Tomjack lies, but he did not want him to die; and (5) Ball's truck contained what appeared to be blood. At trial, the court further found that (6) Schenck and Eng also believed the red substance on the door of Ball's home appeared to be blood.

Although the record shows contradictory evidence about the red substance on the door of Ball's home, the trial court accepted the testimony of Ball's employer and found that the officers believed the substance was blood. The trial court's factual findings are not clearly erroneous. See *State v. Davidson*, 260 Neb. 417, 618 N.W.2d 418 (2000). Moreover, when a motion to suppress is denied pretrial and again during trial on renewed objection, we consider all the evidence, both from trial and from the hearings on the motion to suppress. See *State v. Huffman*, 181 Neb. 356, 148 N.W.2d 321 (1967). Thus, we

consider all of the facts on which the trial court relied. But we pause to note that if the blood in Ball's truck had been discovered through a proper inventory search, the officers would have been unaware of its existence when they arrested Ball. We need not consider the bloodstains in Ball's truck in our probable cause analysis, because the other facts provide sufficient probable cause.

The trial court found the officers knew of at least five incriminating factors when Arndt arrested Ball. Although several of these, taken alone, are insufficient, the totality supports probable cause. Ball came to Tomjack's home late at night freshly showered and changed, claiming he wanted to borrow cigarettes. When he saw the crowd, he repeatedly inquired about Tomjack. It is true that these facts could have innocent explanations. Yet, we cannot ignore that Ball told Schenck: "[Tomjack] made me so mad because he was lying about all the hours he was getting in this new job, and he bragged about it, and he made me so mad about that. . . . But I didn't want him to die." Nor can we ignore the testimony of Ball's employer that the officers told him they saw blood on the door of Ball's home. See, e.g., *Butler v. State*, 217 So. 2d 3 (Miss. 1968) (finding probable cause when officers found large puddle of blood at crime scene and after identifying possible suspect, found blood on door of suspect's home).

Knowing that the murder scene was bloody and that the assailant, when leaving, had smeared blood on the door of Tomjack's home, the officers could reasonably infer that the assailant would have blood on his or her clothes or person. This would explain the apparent blood on the door of Ball's home and explain why he had recently showered. Ball, however, argues that his presence at Tomjack's home was not unusual because, like many of the others at the scene, he was a local resident. But the other residents came to help locate the 911 emergency caller, whereas Ball claimed to be interested in borrowing cigarettes.

"In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 2d 1879 (1949). A reasonable and prudent person could believe that

Ball committed the murder; therefore, the officers had probable cause to arrest Ball. Because we find no Fourth Amendment violation, there is no taint to purge under *Kaupp v. Texas*, 538 U.S. 626, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003).

(b) Fifth Amendment

Ball argues that both of his statements to Redinger should have been suppressed because Redinger violated his Fifth Amendment rights by ignoring his request for counsel. The Fifth Amendment does not explicitly afford a right to counsel; it provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. But the U.S. Supreme Court recognized the " 'inherently compelling pressures' " of custodial interrogation and established "prophylactic rights" designed to counteract those pressures; one such right is the right to have counsel present during custodial interrogation. *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991) (citing and quoting *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

*Miranda* prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates that its agents used procedural safeguards that are effective to secure the privilege against self-incrimination. See, *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003); *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement officers after one has been taken into custody or is otherwise deprived of one's freedom of action in any significant way. *State v. Voichahoske*, 271 Neb. 64, 709 N.W.2d 659 (2006). The dispositive factor in determining whether *Miranda* warnings should have been given is whether a reasonable person would have felt free to leave under the circumstances. *State v. Dallmann, supra.*

Here, the trial court found, and the State concedes, that Ball was in custody once Arndt handcuffed him and drove him to the station. Further, no one disputes that Redinger questioned Ball twice at the station. Because Redinger subjected Ball to custodial interrogation during those interviews, *Miranda* warnings were necessary before each interview. Here, Redinger informed

Ball of his *Miranda* rights before questioning him each time, and each time Ball waived them, signing his name at the end of the form.

 *Miranda* rights can be waived if the suspect does so knowingly and voluntarily. See *McNeil v. Wisconsin, supra.* But once a suspect asserts the *Miranda* right to counsel, interrogation must cease and police may not approach the suspect for further interrogation until counsel is made available. *McNeil v. Wisconsin, supra* (citing *Miranda v. Arizona, supra*).

> If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.

*McNeil v. Wisconsin,* 501 U.S. at 177 (citing *Edwards v. Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)). See, also, *State v. Joy,* 218 Neb. 310, 353 N.W.2d 23 (1984).

 But a suspect cannot invoke *Miranda* rights anticipatorily, that is, before or outside the context of custodial interrogation. See, *McNeil v. Wisconsin, supra*; *State v. Mata, supra.* "It is clear . . . that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

Despite this, Ball argues that by asking Arndt for court-appointed counsel at the jail, he asserted his *Miranda* rights, which the police must strictly respect. Although the State concedes Ball was in custody when he invoked his right to counsel, we note that he was *awaiting* interrogation when he made the request. Nonetheless, we need not decide whether his invocation was anticipatory because the State implicitly concedes that Ball effectively invoked his *Miranda* rights. See brief for appellee at 19 (conceding that Ball's first statement to Redinger was "properly suppressed").

 Assuming that Ball effectively invoked his *Miranda* rights, what effect did the invocation have on the admissibility of his statements? Under *Edwards v. Arizona,* once a defendant

invokes his right to counsel, any subsequent questioning without counsel should be suppressed even if the suspect waives his *Miranda* rights. But when the accused *"initiates* further communication, exchanges, or conversations with the police," is informed of his *Miranda* rights, and waives them before further interrogation, we must determine whether the waiver was knowing and intelligent under the totality of the circumstances. (Emphasis supplied.) *Edwards v. Arizona,* 451 U.S. at 485. See, also, *State v. Smith,* 242 Neb. 296, 494 N.W.2d 558 (1993). As this court recognized in *Smith,* this determination depends on the particular facts and circumstances, including the background, experience, and conduct of the accused.

Ball does not dispute that he initiated further communication; instead, he contends that his request to speak with Redinger was not a willing choice to waive counsel because he had not slept, he had been kept from his home and truck, and he was interrogated without counsel. Although the record shows that Ball was intoxicated the night before the interrogation, neither exhaustion nor intoxication will necessarily invalidate a *Miranda* waiver. See *State v. Williams,* 269 Neb. 917, 697 N.W.2d 273 (2005). Moreover, the trial court found that the State sustained its burden of showing that Ball's verbal and written statements during the second interview were made "voluntarily as an act of free will, and without coercion or intimidation."

A trial court's preliminary determination that a statement was made voluntarily will not be disturbed on appeal unless clearly wrong. *State v. Garza,* 241 Neb. 934, 492 N.W.2d 32 (1992). Because the trial court's ruling was not clearly wrong, we defer to the trial court's findings that Ball waived the right voluntarily.

Although the trial court found the waiver voluntary, it made no explicit findings whether Ball waived his rights knowingly. Despite this, the record demonstrates that Ball knowingly waived his rights. Redinger advised him of his *Miranda* rights before he gave each statement. Moreover, Ball nodded his head when Redinger read him the waiver form. And most important, he asserted his right to counsel to end the first interview, which demonstrates that he understood the effect that exercising his rights would have. See *State v. Garza, supra.* See, also, *State v. Smith, supra.*

In summary, Ball's appeal to the Fifth Amendment as support for suppressing his confession is unavailing. We conclude that Ball knowingly and intelligently waived his *Miranda* rights after initiating the second interview with Redinger.

### (c) Sixth Amendment

Ball argues that Redinger violated his Sixth Amendment right to counsel and that his statements should be suppressed. We disagree. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The U.S. Supreme Court has clarified that the Sixth Amendment right to counsel is triggered " 'at or after the time that judicial proceedings have been initiated . . . "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." ' " *Fellers v. United States*, 540 U.S. 519, 523, 124 S. Ct. 1019, 157 L. Ed. 2d 1016 (2004) (quoting *Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977)). Accord *Kirby v. Illinois*, 406 U.S. 682, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972).

Here, Ball requested an attorney before he was formally charged. Thus, his Sixth Amendment right to counsel had not attached. However, Ball relies on *Escobedo v. Illinois*, 378 U.S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977 (1964), which suggested that a suspect's Sixth Amendment rights are implicated when an investigation begins to focus on a particular suspect.

Ball argues that once the State turns its prosecutorial focus on a defendant, the Sixth Amendment right to counsel attaches. But as this court recognized in *State v. Saylor*, 223 Neb. 694, 392 N.W.2d 789 (1986), the U.S. Supreme Court has gradually abandoned *Escobedo*, concluding that the Sixth Amendment right to counsel does not attach until after the initiation of formal charges. Because Ball was not formally charged until after he confessed, his Sixth Amendment right to counsel had not attached, and thus, his assignments of error lack merit.

### 3. SEARCH WARRANT AFFIDAVITS

A trial court's ruling on a motion to suppress, based on a claim of insufficiency of the affidavit supporting issuance of a search warrant, will be upheld unless its findings are clearly erroneous. In making this determination, we do not reweigh the

evidence or resolve conflicts in the evidence, but, rather, we recognize the trial court as the finder of fact and we consider it observed the witnesses. See *State v. Thomas*, 267 Neb. 339, 673 N.W.2d 897 (2004).

The court properly upheld the search warrant affidavits because both the evidence of bloodstains from Ball's truck and his confession were properly admitted at trial.

## V. CONCLUSION

The evidence of bloodstains in Ball's truck was properly admitted under the inevitable discovery doctrine because Arnold testified that the stains were readily visible from inside the truck's cab, the State Patrol's policy was to inventory abandoned vehicles after 24 hours, and Ball could not claim the truck because he was under arrest for murdering Tomjack.

Furthermore, Ball's confession was properly admitted because he cannot rely on the Fourth, Fifth, or Sixth Amendment to justify suppressing it. His arrest was justified by probable cause and need not be suppressed under *Kaupp v. Texas*, 538 U.S. 626, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003). Assuming Ball invoked his Fifth Amendment rights in a timely manner, he knowingly and intelligently waived them after initiating the second interview, when he confessed to the murder. Moreover, his Sixth Amendment rights had not attached because the State had not formally charged him with the murder when he invoked his right to counsel. Finally, the court properly upheld the search warrant affidavits because both the evidence of bloodstains from his truck and his confession were properly admitted.

AFFIRMED.